**J.K. AND SUSIE L. WADLEY RESEARCH INSTITUTE AND BLOOD BANK, Relator,**

v.

**Mark WHITTINGTON, Judge Presiding, 160th District Court, Dallas County, Texas, Respondent.**

**No. 05–92–01018–CV.**

Court of Appeals of Texas, Dallas.

Sept. 9, 1992.

Micki S. Fleetwood, Billie D. Ballangee, Dallas, for appellant.

Christopher A. Payne, Dallas, for appellee.

Before LAGARDE, OVARD and KAPLAN, JJ.

## OPINION

LAGARDE, Justice.

Relator J.K. and Susie L. Wadley Research Institute and Blood Bank seeks a

writ of mandamus against respondent the Honorable Mark Whittington, Judge of the 160th District Court of Dallas County, Texas. Wadley argues that the trial court abused its discretion by compelling the production of certain documents and by not restricting the private investigative activities of the real parties in interest, the immediate family members of decedent Ruth Perkins. The 160th Court signed two orders on March 30, 1992, containing the discovery rulings about which Wadley complains. The court also, however, gave Wadley thirty days to produce the documents at issue and stayed the Perkins family from conducting any private investigation for thirty days. The thirty days ended on April 29. At about 4:15 p.m. on April 29, Wadley filed its motion for leave to file its petition for writ of mandamus and tendered the petition itself. We issued a temporary stay against any further discovery proceedings, to give us a chance to examine the petition. The next morning, on April 30, we summarily denied leave to file the petition for writ of mandamus with respect to some of the 160th Court's discovery rulings [1] and, reserving ruling on the remainder of the motion for leave with respect to one discovery ruling by the 160th Court, we requested the Perkins family to respond. We have reviewed the response. For the reasons given below, we now deny the remainder of Wadley's motion for leave and vacate the stay that we had earlier granted.

## Background

In August 1984, a person to whom we shall refer as Mr. Donor donated some blood to Wadley. Subsequently, Ruth Perkins underwent hospital surgery and received a unit of Mr. Donor's blood components. At about the same time, another unrelated patient, to whom we shall refer as Mr. Recipient, received another unit of Mr. Donor's blood components. Perkins died on June 14, 1991, of AIDS-related complications.

The Perkins family brought suit and, in the course of discovery, learned that Mr. Donor also had contracted AIDS. After protracted discovery battles and pursuant to a court order, Wadley produced a redacted copy of Mr. Donor's death certificate. Wadley's petition for writ of mandamus says that the redacted certificate omitted Mr. Donor's real name and the name of the physician who signed the certificate, but it included the date of death, December 7, 1988, and the cause of death: "cardio respiratory [sic] failure as a consequence of auto immune deficiency syndrome." After more discovery battles, the Perkins family sought to learn whether the physician who signed the death certificate was the treating physician for Mr. Donor during the terminal stages of Mr. Donor's illness in late 1991.[2] The Perkins family announced its intention to depose the treating physician. Wadley argued, both to the 160th Court and to this Court in its petition for writ of mandamus, that the state of Mr. Donor's health, some seven years after he gave the original donation in 1984, was irrelevant. The Perkins family also intended to search the Dallas County Public Records to obtain a complete copy of Mr. Donor's death certificate. At some point—we are not told when, nor do we have a copy of the order—the 160th Court placed certain restrictions on the Perkins family's counsel, prohibiting him from conducting a private investigation to determine Mr. Donor's identity.

In the meantime, the Perkins family learned that Mr. Recipient also had contracted serious health problems. He was treated at Granville C. Morton Hospital,

---

1. With respect to the discovery rulings for which we denied leave, Wadley evidently filed a motion for leave to file a petition for writ of mandamus with the Supreme Court of Texas. After granting initial stay relief, the supreme court denied Wadley's motion for leave to file and vacated its original stay. Order of May 20, 1992, in cause no. D–2363, styled *J.K. & Susie L. Wadley Research Institute & Blood Bank v. Whittington*, 35 Tex.Sup.Ct.J. 753. We were not provided a courtesy copy but presume that Wadley did not complain, in cause no. D–2363, of the discovery ruling made by the 160th Court that we ordered stayed and to which we requested the Perkins family to respond.

2. The discrepancy in the possible dates of Mr. Donor's death is never explained.

which, at the time, was owned and operated by Wadley. The hospital is no longer in operation, but Wadley maintains its records. The Perkins family sought Morton Hospital's records concerning Mr. Recipient's treatment. Wadley filed a crossmotion for a protective order. Wadley argued that anything connected with Mr. Recipient's medical treatment was irrelevant to whether Ruth Perkins contracted AIDS from Mr. Donor, because the original donation was given in 1984 and Mr. Donor reached the terminal stages of his illness in 1991.[3] But Mr. Donor never returned to Wadley after the 1984 donation, medical technology was not equipped to test for the presence of the HIV virus (the precursor to AIDS) in 1984, and therefore there was no proof of when Mr. Donor first became infected. The Perkins family countered that, if Mr. Recipient also had contracted AIDS after receiving Mr. Donor's blood component, it would be at least information appearing reasonably calculated to lead to the discovery of admissible evidence.

### The discovery hearings

The 160th Court conducted at least two hearings on the matter. Morton Hospital produced its custodian of records, Earl Greathouse, who testified as follows:

Q. At the time the records in question—at the time the records in question were prepared, was the Morton Hospital one of several separate distinct entities that made up the J.K. and Susie L. Wadley Research Institute and Blood Bank?

A. Yes, they were.

Q. Mr. Greathouse, I'm handing you what has been marked as [Wadley's] Exhibit Number A. Is this the notice of intention to take deposition upon written questions that you received asking Morton to produce medical records in this case?

A. Yes, I believe it is.

Q. And have you had an opportunity to inquire as to what would be involved, Mr. Greathouse, in the production of these records?

A. Yes, I have.

\* \* \* \* \* \*

Q. Okay. Now as it relates to the records at Morton Hospital for that donor, can you describe to the Court how those records are housed?

A. They're in deep storage in a warehouse. They are on microfilm and they, along with all the medical records for Morton Hospital, are so stored.

Q. Have you made a cursory review of those documents?

A. Yes. The clerk I have employed has located at least one film strip, and by count and by number of feet, we determined that this record would probably be in excess of a thousand pages. At the end of that tape there was a note "see next volume," and we as yet have not located that second volume.

\* \* \* \* \* \*

Q. Do you have any way of estimating approximately how long, it would take you to get all of those records out of storage?

A. Again, it would be hard to guess at this point in time. Based on some other records, it would be in the weeks area. I could not tell you exactly because I don't—we have not located the next volume, and it could also say "see the next volume." That I haven't found yet, so I don't know how long this might take, but it would be in weeks, two or more.

\* \* \* \* \* \*

Q. Have you made a determination, Mr. Greathouse, as to whether there is an HIV test in those medical records on this particular patient [Mr. Recipient]?

A. I personally have not.

Q. Do you have reason to believe that there is one, or when you say you don't personally know that—

---

3. We note that, in another case before this Court, Wadley admitted that when a blood donor's donation is broken into two components and each component is given to a different recipient, the fact that the donor and both recipients subsequently come down with AIDS is "strong evidence" that the donor's blood was infected. *J.K. & Susie L. Wadley Research Inst. & Blood Bank v. Beeson*, 835 S.W.2d 689, 700 (Tex.App.—Dallas 1992, writ pending).

A. I—

Q. You just don't know?

A. I just don't know.

\* \* \* \* \* \*

Q. Now during the time that Morton Hospital was open would the medical records on this patient have—all relate to medical records on this patient have—all relate to medical care that he received at Morton Hospital?

A. Yes.

Q. Would the records be records of medical treatment by a physician or by a hospital or nurse personnel that were assisting a physician in treating this patient?

A. That is correct.

Q. Would the physicians at Morton Hospital that treated the patient have been licensed to practice law in the State of Texas?

A. Yes, they would.

THE COURT: Medicine you mean, I'm sure.

Q. Were they licensed to practice medicine, Mr. Greathouse?

A. Yes.

Q. Have—is there anything that you're aware of that would indicate that that patient intended that information to be disclosed to third parties?

A. Everyone I think personally prefers to keep their records very privileged.

Q. To your knowledge is there any release from this patient allowing his records to be disclosed to the [Perkins family's] lawyers in this case, or to the public at large?

A. No.

The 160th Court then signed the two orders of March 30. The first order compelled Wadley to produce, within thirty days, the name of the physician who signed Mr. Donor's death certificate. It also lifted whatever restrictions it had placed upon the Perkins family's counsel's independent investigation of Mr. Donor's background, except that he could not contact Mr. Donor's family members or employers without first obtaining leave of court. It further prohibited the Perkins family's counsel from undertaking such an investigation for thirty days.[4]

The second order compelled Morton Hospital to produce all "test results," as defined by section 81.101(5) of the Texas Health and Safety Code, including transfusion records, lab-test results, admitting and discharge summaries, and blood-test results, for Mr. Recipient. It further ordered that no documents related to Mr. Recipient were to be produced; apparently, Wadley had to produce only a written statement of what the "test results" were. Any information that might disclose Mr. Recipient's identity was to be redacted; Morton, through Wadley, was entitled to assert any attorney-client privilege that it might have had; and, if any doctors who were defendants in the underlying litigation were mentioned in the documents responsive to the order, those documents were to be produced for an *in camera* inspection. Once again, the order compelled discovery within thirty days. In short, on the morning of April 30, the Perkins family could demand the documents from Wadley and could also research the Dallas County Public Records for Mr. Donor's unredacted death certificate.

## Wadley's petition for writ of mandamus

At about 4:15 p.m. on April 29, Wadley filed its motion for leave to file petition for writ of mandamus and tendered its petition. Wadley's counsel requested immediate emergency relief: her concern was that, unless we ruled before the end of the business day on April 29, the Perkins family's counsel would be searching through the Dallas County Public Records to find all the death certificates of anyone who died on December 7, 1988, of cardiorespira-

---

**4.** This order, containing two of the 160th Court's discovery rulings, appears to have been the subject of Wadley's motion for leave to file petition for writ of mandamus in the supreme court. We expressly do not reach the merits of Wadley's claims that, by so ruling, the 160th Court abused its discretion. Now that the supreme court has denied Wadley mandamus relief in connection with the first order signed, we have nothing more to say about it.

tory complications from AIDS. As Wadley points out, the number of death certificates fitting such a description would be severely limited; unless we granted an emergency stay, the Perkins family would obtain Mr. Donor's identity and could start investigating his friends and coworkers (but not his family members or employers). With misgiving, we granted an emergency stay late in the afternoon of April 29.

Wadley's petition for writ of mandamus is thirty-eight pages long. It complains of three separate rulings of the trial court: (1) the order compelling the name of the physician who signed Mr. Donor's death certificate; (2) the lifting of any restrictions, other than contacting Mr. Donor's family members and employers, on the Perkins family's ability to pursue its own private investigation into Mr. Donor's background; and (3) the order compelling the discovery of the "test results" done upon Mr. Recipient by Morton Hospital. It argues that: (1) public policy mandated the confidentiality of blood donors to protect the source of the nation's blood supply; (2) Wadley produced two expert witnesses who gave uncontroverted testimony that compelling the production of a blood donor's identity would chill prospective donors from giving blood; (3) the discovery that the Perkins family sought was only slightly likely to lead to relevant, probative evidence, in any case; (4) the orders violated certain sections of chapter 162 of the Texas Health and Safety Code; (5) the production of the Morton Hospital records concerning Mr. Recipient violated the physician/patient privilege; (6) before the 160th Court ordered the production of any documents, it was required to conduct an *in camera* inspection; (7) the order's permitting Wadley to redact anything that might reveal Mr. Recipient's identity did not validate the order; (8) ordering the "test results" to be produced violated chapter 81 of the Texas Health and Safety Code; and (9) ordering the records produced violated Mr. Recipient's rights to privacy, both under Texas law and under the United States Constitu-

tion. In short, Wadley's petition complains of three separate rulings under nine different legal theories. To marshal its argument, Wadley cites thirty-six different cases, many from other jurisdictions, groping with the novel questions raised by the AIDS epidemic; nine separate provisions of the Texas Health and Safety Code; one rule of evidence; and three secondary sources.[5] The presentation of the background facts, the procedural history of the case, and the legal argument are interspersed, with the petition switching back and forth in no apparent order. The result is that the petition is difficult to follow or to comprehend easily; it must be carefully studied and reread. As indicated, whether Mr. Donor died on December 7, 1988, or sometime in the year 1991, is not clear from the petition itself, which gives one date in one place and the other date in another place. The petition has attached exhibits easily in excess of two hundred pages, to which resort must be made to clarify the petition, but even then the exhibits never clarify exactly when Mr. Donor died.

We had to digest all this material, sift out the facts, consider the three complaints, sort out the nine legal theories and determine which theories were applicable to which complaints, and determine whether to issue an order granting Wadley emergency stay relief. And Wadley's timing gave us no more than forty-five minutes to do so.

### Request for emergency stay relief

We simply could not determine anything about the merits of Wadley's petition on April 29. Nonetheless, we issued a stay, in order to place the discovery on hold until we had a chance to review the merits. We issued the stay without deciding the motion for leave to file the petition for writ of mandamus. We did so with misgiving.

■■■ A petition for writ of mandamus must be accompanied by a motion for leave

---

5. This count comes from the table of authorities given in the introductory apparatus to Wadley's brief. No effort was made to confirm its accu-racy independently from the text of the petition itself.

to file it. *See Wright v. Valderas*, 575 S.W.2d 405, 406 (Tex.Civ.App.—Fort Worth 1978, orig. proceeding) (per curiam). Until the motion for leave is granted, the petition itself is not filed. *See Wright*, 575 S.W.2d at 407. Until the petition itself is filed, the original proceeding is not properly before the Court. Yet a writ of prohibition will not issue to protect our jurisdiction in a case until we have actually *acquired* jurisdiction over the case. *See Carroll v. Robertson*, 615 S.W.2d 843, 844 (Tex.Civ.App.—Houston [1st Dist.] 1981, orig. proceeding). We recognize that a stay is not a writ of prohibition: a stay is intended to be only temporary, and the requisite showing for a stay is less formal than the requisite showing for a writ of prohibition. *But see Lamar Builders, Inc., v. Guardian Sav. & Loan Ass'n*, 786 S.W.2d 789, 790–91 (Tex.App.—Houston [1st Dist.] 1990, no writ) (a motion for temporary injunctive relief under TEX.R.APP.P. 43 filed before the record is filed must be supported by a certified or sworn copy of each relevant exhibit, as required by TEX.R.APP.P. 121). Nonetheless, we have grave doubts whether we have jurisdiction to issue a temporary stay before we have asserted jurisdiction over the original proceeding by granting the motion for leave to file it.[6]

Assuming that we do have *jurisdiction* to issue a stay before determining a motion for leave to file an original proceeding, we still question whether we have the *authority*. Rule 121 of the Texas Rules of Appellate Procedure provides in part:

> If the facts stated in the petition show that relator will be prejudiced unless immediate temporary relief is granted, the court may grant temporary relief *after granting the motion for leave to file*, without notice to respondents, as the exigencies of the case require.

TEX.R.APP.P. 121(d) (emphasis added). The rule presupposes that we have had the opportunity to review the petition accompanying the motion for leave to determine the motion for leave to file it. Similarly, the rule provides that we can grant the motion for leave only "[i]f the court is of the tentative opinion that relator is entitled to the relief sought." TEX.R.APP.P. 121(c). We see nothing in the rule that permits us to issue a stay on what amounts to no more than a relator's representation that, unless an immediate stay issues, the petition will quickly become moot. We see nothing in the rule that permits us to issue a stay solely to give this Court a window of time in which to review the petition.

■ A long delay in filing a motion for leave to file a petition for writ of mandamus can result in the motion's being denied because of laches. *See Bailey v. Baker*, 696 S.W.2d 255, 256 (Tex.App.—Houston [14th Dist.] 1985, orig. proceeding) (per curiam). In *Bailey*, the relator was aggrieved by a discovery order signed on April 10, 1985. He waited until nearly four months later, when he filed a motion for leave to file a petition for writ of mandamus on August 2. Trial was set for little more than two weeks later. On that ground, the court of appeals denied the motion for leave. *Bailey*, 696 S.W.2d at 256. We acknowledge that, in this case, Wadley had exactly thirty days in which to prepare a petition for writ of mandamus, get it filed here, and obtain a stay of the 160th Court's orders pending disposition of the original proceeding. Wadley's time was limited, and we certainly do not delude ourselves into thinking that this case was the only one requiring its attorneys' attention during that time.

■ Nonetheless, this Court cannot be forced into a position where it must issue a stay precipitously, before it has had an opportunity to assess the merits of an original proceeding. We must be allowed the time to reach a tentative opinion that a

6. An alternative would have been to have granted the motion for leave and issued the stay; then, after we had reviewed the petition itself, we could have vacated the order granting leave as improvidently granted. But without the opportunity to give the petition significant review, we fail to see how this alternative method is anything more than an elevation of form over substance. A motion is properly vacated as improvidently granted when the motion makes a *prima facie* case of having merit and something subsequently occurs to make the Court reconsider what it already has considered.

motion for leave should be granted before we issue a stay. There is, of course, no definite amount of time that is required: the amount of time varies from case to case. Factors influencing the amount of time necessary include the complexity of the issues involved, the facts necessary to show a relator's entitlement to relief, and the volume of the sworn or certified exhibits supporting the petition. If, for example, the complaint is that the trial court granted an untimely filed motion for new trial, the issue is a simple one of timeliness, the relevant facts include only a few dates, and the Court need look only to the signature dates and filestamps of a few instruments to determine whether the record supports the complaint. Under such circumstances, forty-five minutes may well be enough to reach a tentative opinion on the merits. We also recognize that the exigencies of a case might require a relator to seek immediate action from this Court. The 160th Court gave Wadley thirty days before its discovery orders went into effect,[7] but, if it had given Wadley only twenty-four hours, the time Wadley could have afforded us to review its petition would necessarily have been shorter.

 In this case, however, Wadley complained of three separate rulings of the 160th Court, raised multifarious legal arguments in support of its position (some of which involve rather novel questions because of the relative novelty of the AIDS crisis), and supported its petition with a record of over two hundred pages. We could not possibly have reached, and did not reach, any tentative opinion on the merits before we issued the emergency stay. Nor did Wadley give any reason why it could not have filed its motion for leave sooner. A relator who requests emergency relief before a certain deadline must file its original proceeding sufficiently before that deadline to afford this Court an opportunity for meaningful review and to reach a tentative opinion that the motion for leave should be granted; at the very least, a relator must give a reasonable explanation

of why the exigencies peculiar to the case prevented it from doing so. A relator who fails to do so risks being denied relief: this Court cannot ignore the plain wording of rule 121(d) of the Texas Rules of Appellate Procedure merely because a party needs help. Nor should a relator generally be able to obtain *ex parte* emergency relief merely because it has been dilatory in requesting it and because its eleventh-hour request prevents this Court from obtaining and considering a response from a real party in interest before granting any emergency relief.

We shall address the merits of Wadley's petition to the extent that we have not already summarily denied its motion for leave. We are convinced that Wadley simply did not consider the position that it was putting this Court in when it sought an emergency stay in so little time. We caution, however, that we might not allow ourselves to be placed in a similar position in the future, whatever the consequences to the relator might be. We say so deliberately, for the guidance of the bar. *Cf. Ex parte Harrison,* 741 S.W.2d 607, 609 (Tex. App.—Austin 1987, orig. proceeding).

### The merits

 This Court has remaining before it Wadley's motion for leave to file petition for writ of mandamus seeking relief from the 160th Court's order compelling production of all "test results," as defined by section 81.101(5) of the Texas Health and Safety Code. Section 81.101 defines terms as used "[i]n this subchapter," *i.e.,* subchapter F of chapter 81. TEX. HEALTH & SAFETY CODE ANN. § 81.101 (Vernon 1992). In its entirety, subchapter F sets out the circumstances under which a person might be required to undergo AIDS or HIV testing. *See* TEX.HEALTH & SAFETY CODE ANN. § 81.102(a) (Vernon 1992). One such circumstance occurs when "a medical procedure is to be performed on the person that could expose health care personnel to AIDS or HIV infection, . . . and there is sufficient

---

7. We expressly approve of the 160th Court's doing so. A trial court that makes its discovery orders effective immediately or within a very

short time deprives this Court of an opportunity for meaningful review of its orders and puts us in the same dilemma that we faced in this case.

time to receive the test result before the procedure is conducted." TEX.HEALTH & SAFETY CODE ANN. § 81.102(a)(3) (Vernon 1992).

The result of the required AIDS or HIV testing is confidential. *See* TEX.HEALTH & SAFETY CODE ANN. § 81.103(a) (Vernon 1992). However, the result may be disclosed to the physician or other person authorized by law who ordered the test, TEX.HEALTH & SAFETY CODE ANN. § 81.-103(b)(4) (Vernon 1992), and to a physician, nurse, or other health-care personnel who have a legitimate need to know the test result in order to provide for their protection and to provide for the patient's health and welfare, TEX. HEALTH & SAFETY CODE ANN. § 81.103(b)(5) (Vernon 1992).

 The question then becomes whether the confidentiality requirement of section 81.103(a) is identical to, or at least of the same scope, as the physician-patient privilege. We reach this question because Wadley offered evidence that the documents, for which it resisted discovery from the Perkins family, were covered by the physician-patient privilege. It offered no evidence that the documents were covered by the confidentiality requirement of section 81.103(a). Indeed, Mr. Greathouse, speaking as Wadley's custodian of records, acknowledged that he did not know whether Mr. Recipient's records included the result of any testing for AIDS or HIV.[8] Unless the scope of the protection afforded by the confidentiality requirement of section 81.103(a) is co-extensive with the scope of that afforded by the physician-patient privilege, evidence of the physician-patient privilege will not support a claim of confidentiality under section 81.103(a).

(1) A "patient" means any person who consults or is seen by a physician *to receive medical care.*

 ....

(3) A communication is "confidential" *if not intended to be disclosed to third persons other than those present to fur-*

*ther the interest of the patient* in the consultation, examination, or interview, or persons reasonably necessary for the transmission of the communication, or persons who are participating in the diagnosis and treatment under the direction of the physician, including members of the patient's family.

TEX.R.CIV.EVID. 509(a)(1), (3) (emphasis added). The physician-patient relationship is contractual and wholly voluntary, created by agreement, express or implied. *Garay v. County of Bexar,* 810 S.W.2d 760, 764 (Tex.App.—San Antonio 1991, writ denied). Thus, if Mr. Recipient was tested for AIDS or the HIV virus under subchapter F of chapter 81 of the Texas Health and Safety Code, the testing itself was not conducted within the context of a physician-patient relationship. First, such testing can be compelled; it is not wholly voluntary. Second, Morton Hospital would have initiated the testing to protect its own health-care personnel; the testing would not have been for the purpose of providing informed medical care to Mr. Recipient. We acknowledge that Mr. Recipient would not have been in Morton Hospital in the first place if he had not been seeking medical care. But the testing was not done as part of Mr. Recipient's medical care but as a prophylactic measure for the benefit of Morton Hospital's health-care personnel. To conclude that records of Mr. Recipient's testing are protected by the physician-patient privilege simply because they were created by a hospital that was coincidentally giving him medical care at the same time would be tantamount to holding that all hospital records, created and maintained for whatever purpose, are covered by the physician-patient privilege. Indeed, from Mr. Greathouse's testimony, it appears that Wadley takes that position. We decline to do so, however. Merely because a hospital's primary function is to provide medical care does not mean that every record main-

---

8. Both in the trial court and in this original proceeding, Wadley argues that section 81.-103(a) of the Texas Health and Safety Code provides an alternative rationale for keeping the records of Morton Hospital pertaining to Mr. Recipient confidential. We assume, but do not decide, that Wadley has preserved whatever right it has, as an abstract proposition of law, to keeping confidential the documents to which that section applies.

tained by the hospital is subject to the physician-patient privilege. *Cf. Tarrant County Hosp. Dist. v. Hughes,* 734 S.W.2d 675, 677 (Tex.App.—Fort Worth 1987, orig. proceeding) (en banc) (hospital records pertaining to donors who gave blood donations directly to the hospital held not privileged).

We should not be understood as saying that, because a specific document in the custody of a hospital is not subject to the physician-patient privilege, it is therefore discoverable. Indeed, the "test results" at issue in this case, as we remarked earlier, are subject to the confidentiality requirements of section 81.103 of the Texas Health and Safety Code. Nor do we discount the possibility that a given document might be covered by both the physician-patient privilege and the section 81.103 confidentiality requirements: a patient might voluntarily undergo diagnostic testing and, if the results turned out to be AIDS or HIV positive, the same test results could be used to alert health-care personnel to take appropriate precautions.

■■■ Yet the procedure that a party asserting a privilege must follow is well established:

> [A]ny party who seeks to exclude documents, records or other matters from the discovery process has the affirmative duty *to specifically plead the particular privilege or immunity claimed* and to request a hearing on his motion. The trial court should then determine whether an in camera inspection is necessary. If such an inspection is ordered by the trial court, those materials for which the inspection is sought must be segregated and produced to the court. Failure to follow the above procedure constitutes a waiver of any complaint of the trial court's action.

*Peeples v. Fourth Court of Appeals,* 701 S.W.2d 635, 637 (Tex.1985) (emphasis added). A "specific" objection is one which enables the trial court to understand the

*precise* grounds so as to make an informed ruling. *See McKinney v. National Union Fire Ins. Co.,* 772 S.W.2d 72, 74 (Tex.1989). At the hearings in this discovery dispute, Wadley presented no evidence at all that any of the documents sought were protected by the section 81.103 confidentiality requirements. Indeed, Mr. Greathouse testified that he did not even know whether any of the documents sought involved HIV testing. The only evidence presented concerned the physician-patient privilege. Mr. Greathouse admitted that he had gone through the records in a cursory fashion, that he had not reviewed them all, and that he had not even located all of Mr. Recipient's medical records. He testified generally that, because they were hospital records, they would have been records generated by physicians, or by personnel under their supervision, in connection with Mr. Recipient's medical care. But we have already concluded that not every hospital record is covered by the physician-patient privilege. To the extent that the 160th Court ordered Wadley to produce "test results" as defined by section 81.101(5) of the Texas Health and Safety Code, it may well be that the physician-patient privilege is not even relevant.

It was incumbent upon Wadley to locate all of Mr. Recipient's hospital records and to plead specifically to which of those records the physician-patient privilege attached, to which of those records section 81.103 applied, and to which of those records, if any, both the physician-patient privilege and section 81.103 applied. Instead, Wadley relied upon a global assertion that the physician-patient privilege applied, even to documents that it had not yet located. Wadley's objection to the Perkins family's discovery request was not sufficiently specific to direct the 160th Court's attention to the precise grounds for the objection with respect to a single document. Wadley did not tender the documents.[9] For any given

9. The order complained of in this proceeding was signed on March 30, 1992. On February 7, 1992, Wadley had filed a motion to quash and for protective order in connection with the noticed deposition of the custodian of records for Morton Hospital. The motion did not offer a

tender of the documents for *in camera* inspection. On February 20, Wadley filed an amended motion to quash and for protective order. The amended motion did not offer a tender. During the hearings, Wadley did not offer a tender; in fact, it acknowledged that it had not

document included in Mr. Recipient's hospital records, Wadley made no effort to enable the 160th Court to make an informed decision whether that document should be produced. Under these circumstances, we conclude that Wadley has waived any complaint of the 160th Court's action.

To the extent that we have not already done so, we deny Wadley's motion for leave to file petition for writ of mandamus.

KAPLAN, J., concurs in the result only.

yet even located all the documents, so that it had not even placed itself in the position of being able to offer a tender. On March 31, the day after the order was signed, Wadley filed a "supplemental" motion, asking for reconsideration of its motion to quash and for protective order. In this motion, for the first time, Wadley made an offer to tender the documents for *in camera* inspection.

In its petition for writ of mandamus, Wadley argues that the 160th Court abused its discretion by not conducting an *in camera* inspection of the documents. Obviously, the 160th Court committed no abuse of discretion on March 30 by not conducting an *in camera* inspection of documents that had not yet even been offered. Although Wadley characterized its March 31 filing as a "supplemental" motion, the characterization is a misnomer; because the trial court had disposed of the earlier motions, there was nothing left to supplement. The March 31 motion was actually simply a motion to reconsider.

See *Inman's Corp. v. Transamerica Commercial Fin. Corp.*, 825 S.W.2d 473, 478–79 (Tex.App.—Dallas 1991, no writ). Nor can Wadley argue that the 160th Court abused its discretion by failing to conduct an *in camera* inspection once Wadley had finally requested one; a party cannot drag out the discovery process by taking all the procedural steps necessary to protect records from discovery, one by one, and each one only after it has received an adverse ruling from the trial court after the earlier steps. See *Hyundai Motor Am. v. O'Neill*, 839 S.W.2d 474, 481 (Tex.App.—Dallas 1992, orig. proceeding). There must be a finality to rulings on motions, no less than to judgments generally. *A.G. Solar & Co. v. Nordyke*, 744 S.W.2d 646, 648 (Tex. App.—Dallas 1988, no writ). The 160th Court's March 30 order ended that phase of the discovery process concerning Mr. Recipient's hospital records, and it did so on the basis of what the 160th Court had before it at the time.