OPINION OF THE COURT
Diane A. Lebedeff, J.
Defendant New York Blood Center, Inc., doing business as The Greater New York Blood Program (the Center or blood bank), is a New York not-for-profit corporation which collects blood primarily from volunteer donors and distributes the blood and blood products to hospitals and research facilities for transfusions and biomedical research. In 1985, it supplied blood contaminated with the Human Immunodeficiency Virus (HIV) to a hospital, which in turn transfused it to Sarah Bernardo (Bernardo), who later developed Acquired Immune Deficiency Syndrome (AIDS) and died. The suit before the court claims the Center was negligent in screening blood donations.
Plaintiff Betty Roth, as administratrix of Bernardo’s estate, now moves to obtain certain discovery. The contested portion of the motion is the request for an order directing the donor to appear for an examination before trial, with an alternative request, if the donor is deceased, for a deposition of the donor’s nearest relative regarding the donor’s health history. *124 Certain other discovery requests, which are unopposed, do not bear upon the donor’s identity.
The contested requests apparently pose the first instance in which a New York court has had to consider the procedural mandates of a New York statutory provision that directly bears upon identification of an HIV-positive blood donor, an issue which has been addressed by courts in a number of jurisdictions in a variety of factual contexts as litigants and courts struggle to apply discovery concepts to the human tragedies arising from AIDS. This case has several distinct features in that (1) it involves a single transfusion rather than multiple transfusions, (2) the specific donor has been identified by the blood supplier and (3) the blood was drawn prior to the development and release of the test now used to detect the presence of the AIDS virus.
FACTS
In February of 1985, Bernardo entered Downstate Medical Center and underwent a surgical procedure during which she received a transfusion of one unit of blood. It was later determined that the unit of blood was contaminated with the HIV virus and Bernardo eventually became ill with AIDS.
Bernardo commenced this action on or about June 14, 1989, by the service of a summons and verified complaint which interposed one cause of action sounding in negligence against the Center, which had supplied the blood. The Center, which distributed approximately 800,000 units of blood in 1991, is stated to be the largest independent blood center in the country. The complaint alleges that Bernardo was infected as the result of the Center’s negligence in improperly screening donors. On October 24, 1989, Bernardo died from complications brought on by AIDS. The complaint was amended, without opposition, to assert an additional cause of action for wrongful death.[1]
As to the disease itself, the HIV virus that causes AIDS destroys certain white blood cells, called helper lymphocytes, which results in damage to the immune system and the impairment of the body’s ability to combat diseases. As a result, the infected individual becomes vulnerable to infections by bacteria, protozoa, fungi, viruses and cancers which result *125 in life-threatening illnesses. At the present time, there is no known vaccination or cure.
As to the tainted blood involved here, it has been identified as a given unit donated on a particular date. The date the blood was drawn is significant when considering what medical knowledge was available at the time the donation was made to the Center. The donation was made after high-risk groups were identified in 1983 and before the now well-known HIV test was made available to the medical community in 1985.
In early 1981, while AIDS was still an unknown to the medical and scientific communities, a cluster of Karposi’s sarcoma cases in young homosexuals was first noted in the United States (Sicklick and Rubinstein, A Medical Review of AIDS, 14 Hofstra L Rev 5, 6-7 [1985]). In June of 1981, the Centers for Disease Control (CDC) formed a task force to study the phenomenon (Special Report, Epidemiologic Aspects of the Current Outbreak of Karposi’s Sarcoma and Opportunistic Infections, 306 New Eng J Med 248, 248-252 [Jan. 28, 1982]). On January 13, 1983, the American Association of Blood Banks, the American Red Cross, and the Council of Community Blood Centers issued a joint statement indicating that the transmission of AIDS by blood was possible, recommending screening of blood donors, and suggesting limiting blood donation from specific groups then identified as targets of the disease: Haitians, intravenous drug users and homosexual men, especially those who had had multiple partners. In its Morbidity and Mortality Weekly Report of March 4, 1983, the CDC echoed the joint statement’s recommendations.
In March of 1983, the Food and Drug Administration (the FDA), which is the Center’s regulatory authority, issued recommendations which included directives that high-risk groups refrain from donating blood. The Center, in the first quarter of 1983, instituted a confidential unit exclusion (CUE) procedure which relied on truthful answers by donors in exchange for the assurance of confidentiality and anonymity. Pursuant to the CUE procedure, a potential donor was given a form that identified high-risk categories; if a donor fell into one of those groups, the blood bank was to designate that the blood not be used for transfusion.
At the time of the blood donation in question, the CUE procedure was in effect. In addition, as part of those procedures, the phlebotomist, the specialist who draws blood, was required to do a one-on-one health history with the donor, *126 conduct an arm inspection, and ask certain "AIDS questions” which, if answered in the negative, required the staff member to mark the donor form "AIDS negative.”
Not until March of 1985, after both the donation and transfusion, did the FDA license an AIDS testing kit. Full-scale testing was implemented at the Center immediately thereafter. Simultaneously, the Center initiated a "look-back procedure,” under which the records of any donor testing HIV-positive were examined for prior donations and, if such were the case, the blood was traced to determine if it had been used in a transfusion. If the blood had been transfused, the hospital or transfusing facility was contacted so it could advise the recipient patient’s physician.
In 1986, the donor of the blood given to Bernardo again gave blood to the Center. When that blood was tested, the result was HIV-positive and triggered the look-back process. Bernardo was subsequently contacted, tested, and diagnosed as HIV-positive. There has been no suggestion in the record that Bernardo might have contracted AIDS through any other exposure.
Significant discovery has been conducted to date. The blood bank’s procedures were delineated at an examination before trial of the defendant’s Assistant Director of Education and Training, Quality Assurance Department. The phlebotomist who drew the blood was deceased and his employment file was examined by the court in camera, with relevant documents therein turned over to plaintiff’s counsel. The blood bank’s counsel has been cooperative throughout the discovery process, generally only resisting disclosure to raise appropriate confidentiality issues.
DISCUSSION
In all AIDS blood transfusion litigation, there is a broader factual context, which was described in Mondello v New York Blood Ctr. (80 NY2d 219, 229), as follows: "[N]o one can doubt that the provision of blood carries with it inherent grave dangers. There could be no more dramatic example than the instant case, where the transfusions of blood allegedly led to the tragically interrelated deaths * * * Though the medical consequences [of AIDS] in this case are frightening, poignant and distressing, we must nevertheless remain mindful in the assignment of liability context that '[t]he art of healing frequently calls for a balancing of risks and dangers to a patient’ *127 (Perlmutter v Beth David Hosp., 308 NY 100, 107, supra). In the case of blood services, the Legislature, this Court and regulatory agencies have balanced some of the dangers and risks. The choices that are made surely and dramatically affect, for good or ill cannot always be known, the manner and kind of services that are rendered by the respective medical care providers.” With these thoughts in mind, this court must address not liability, but the scope of permissible discovery regarding the identity of a person claimed to have been the source of the AIDS which infected plaintiff’s decedent.
This court, unlike the many courts that have wrestled with the complexities unaided, has the guidance of a recent statute which addresses the specific issue of disclosing the identity of an HIV-positive individual. In addition, the accumulated judicial experience on the issue of discovery in other AIDS transfusion cases continues to provide a valuable perspective. A comprehensive and thoughtful review of those decisions, as well as a listing of prior relevant articles, appears in Note, Transfusion-Related AIDS Litigation: Permitting Limited Discovery from Blood Donors in Single Donor Cases (76 Cornell L Rev 927 [1991]).
Before embarking on an analysis, several practicalities should be considered. It is too often ignored that one possible outcome of donor contact is donor cooperation. A striking example is posed in Wadley Research Inst. & Blood Bank v Beeson (835 SW2d 689 [Tex Ct App 1992]), in which, based upon donor testimony and other factors, the jury found negligence in the blood bank screening procedures. Indeed, the donor may not be surprised by a contact, for one study indicates that 69% of HIV-positive donors were aware of their possible HIV status prior to blood donation (Doll, HIV-Seropositive Persons — Why They Donate Blood, abstracted in 19 Transfusion 80S [Supp 1989], cited in Note, op. cit., at 953, n 231). Further, where the transfusion took place so long ago, there may be no prejudicial impact given the possibility that the donor, if alive, has most likely been diagnosed with AIDS.
Second, in the wake of increased public education efforts and greater body of scientific knowledge about AIDS, the concern about "AIDS hysteria” manifested in the earliest cases has decreased significantly in the most recent. Correspondingly, perhaps because such situations appear in judicial contexts, there is an increased sensitivity to discrimination against HIV-positive individuals. It is a fair summary that the *128 most recent cases more frequently allow disclosure, and do so under increasingly detailed confidentiality restrictions.
Third, as to record redaction and any limitations on discovery, it has been wisely observed that they "offer the donors no guarantees” of complete confidentiality (Doe v American Red Cross Blood Servs., 125 FED 646, 652 [D SC 1989]). Illustrations already exist. For example, in Coleman v American Red Cross (979 F2d 1135 [6th Cir 1992], subsequent to 130 FED 360 [ED Mich 1990], certified question declined 439 Mich 1231, 483 NW2d 621 [Mich 1992]), donor forms were not properly redacted and the identity of the donor was disclosed. Other documents may supply leads, such as a redacted death certificate which discloses sufficient information to allow a plaintiff to search public records for the complete death certificate (see, e.g., Wadley Research Inst. & Blood Bank v Whittington, 843 SW2d 77 [Tex App 1992] [where date of death, cause of death, physician’s name provided leads]). Many different types of documents may be involved (see, Wadley Research Inst. & Blood Bank v Bosworth, 1992 WL 35862 [Tex App 1992] [attorney files]).
Finally, although rarely stated, discovery attempts may be an early step along the path of identifying the donor as a potential additional defendant (see, e.g., Coleman v American Red Cross, supra).
THE NEW YORK PUBLIC HEALTH LAW
Effective as of February 1, 1989, Public Health Law article 27-F, entitled "HIV and AIDS Eelated Information,” established a comprehensive system governing the use of and access to such information in New York. Section 2780 (7) defines "confidential HIV related information” as follows: " 'Confidential HIV related information’ means any information, in the possession of a person who provides one or more health or social services or who obtains the information pursuant to a release of confidential HIV related information, concerning whether an individual has been the subject of an HIV related test, or has HIV infection, HIV related illness or AIDS, or information which identifies or reasonably could identify an individual as having one or more of such conditions, including information pertaining to such individual’s contacts.” (Emphasis added.) As the statement of legislative intent makes clear, a significant reason for confidentiality is the goal of ensuring that there be no deterrent to AIDS testing (L 1988, ch 584, § 1).
*129 The statute bars any identification of a person as having undergone an HIV test.[2] A violation of the mandate of nondisclosure was determined to be a basis for a private cause of action in Matter of V. v State of New York (150 Misc 2d 156 [Ct Cl, 1991, Corbett, J.] [reciting material indicating legislative intent]), Nolley v County of Erie (776 F Supp 715 [WD NY 1991]), and Doe v Roe (155 Misc 2d 392 [Sup Ct, Onondaga County 1992, Reagan, J.]), involving, in the first two instances, prisoners so identified within the prison community, and, in the last case, a doctor who released HIV information in response to a request related to a Pennsylvania workers’ compensation claim, accompanied by the patient’s medical authorization. In this liability context, Matter of V. v State of New York (supra, 150 Misc 2d, at 158), the statute was construed as permitting "disclosure only in narrowly defined need-to-know circumstances.”
As specifically relevant here, article 27-F contains provisions for court-ordered disclosure. Public Health Law § 2785 (1) states: "1. Notwithstanding any other provision of law, no court shall issue an order for the disclosure of confidential HIV related information, except a court of record of competent jurisdiction in accordance with the provisions of this section.” The statute does not apply to a subpoena (Public Health Law § 2785 [4] [c]; McBarnette v Feldman, supra, 153 Misc 2d 627 [Sup Ct, Suffolk County 1992, Cohalan, J.]). To date, the reported requests which have considered donor iden *130 tity disclosure under the statute arose in Federal court where the Federal court’s own broad discretion was found to govern the issues (Borzillieri v American Natl. Red Cross, 139 FRD 284 [WD NY 1992, protected order vacated 1992, Curtin, J.] [a transfusion case which was ultimately settled]; Martinez v Brazen, 1992 WL 93245 [SD NY 1992, Patterson, J.] [transmittal in sexual relationship claimed, plaintiff required to demonstrate good-faith basis for suit by depositing HIV information with court and, thereafter, defendant to deposit with the court any HIV test results, found essential to plaintiff’s cause of action]).[3]
The Public Health Law explicitly defines the showing that must be made by the party seeking disclosure. Public Health Law § 2785 (2) provides: "2. A court may grant an order for disclosure of confidential HIV related information upon an application showing: (a) a compelling need for disclosure of the information for the adjudication of a criminal or civil proceeding; (b) a clear and imminent danger to an individual whose life or health may unknowingly be at significant risk as a result of contact with the individual to whom the information pertains; (c) upon application of a state, county or local health officer, a clear and imminent danger to the public health; or (d) that the applicant is lawfully entitled to the disclosure and the disclosure is consistent with the provisions of this article.” (Emphasis added.) The alternatives (b) and (c) are clearly inapplicable here. Thus, to obtain the disclosure sought, the plaintiff must satisfy the requirements of the first alternative and show a "compelling need,” which in this particular instance relates to whether plaintiff can establish that the information sought will bear upon her claim, a factor which must be weighed on a case-by-case basis.[4] In addition to the *131 relevance requirement embraced in the compelling need concept, three other interrelated statutory provisions require that court-ordered disclosure (1) confine the scope of the disclosure permitted, (2) limit access to the information, and (3) weigh the impact of any disclosure order on the donor and the policy of encouraging HIV and AIDS testing and treatment.
As to the first additional item, any court order must "limit disclosure to that information which is necessary to fulfill the purpose for which the order is granted” (Public Health Law § 2785 [6]). Given this statutory restriction, a request for unlimited contact with the donor, which might include personal questions, must be disfavored (see, finding such a broad request unjustified in relation to a single donor, Doe v American Red Cross Blood Servs., supra, 125 FDR, at 652; Bradway v American Natl. Red Cross, 132 FRD 78, 80 [ND Ga 1990]; compare, declining broad request in multiple-donor case with a request for the names and addresses of a large number of donors, with perhaps some of the donors not being HIV-positive, Krygier v Airweld, Inc., supra, discussed further in n 3).
Second, an order must restrict initial access to the information disclosed to "those persons whose need for the information is the basis for the order, and specifically prohibit redisclosure by such persons to any other persons, whether or not they are parties” (Public Health Law § 2785 [6] [b]). The Legislature has placed New York State firmly in the camp of those jurisdictions which permit discovery in relation to an HIV source by a means which maintains some confidentiality. Even without the statute, many courts have limited the disclosure of the identity of the donor to plaintiff’s attorney and directed information to be kept confidential (Mason v Regional Med. Ctr., 121 FRD 300, 303 [WD Ky 1988] [disclosure to counsel]; Doe v Puget Sound Blood Ctr., 117 Wash 2d *132 772, 819 P2d 370 [1991] [confidential until and unless donor joined as a party defendant]; Most v Tulane Med. Ctr., 576 So 2d 1387 [La 1991] [purpose limited to obtaining information about pretest screening procedures]; Gulf Coast Regional Blood Ctr. v Houston, 745 SW2d 557, 560 [Tex App 1988] [sealed records to be deposited with the court, to be utilized by counsel only on court order]).
On this point, it must be emphasized that the statute renders disclosure discretionary, since it states that the "court may grant an order for disclosure” (Public Health Law § 2785 [2]; emphasis added). In this delicate and sensitive area, the court is fully entitled to take into account the trustworthiness of the recipient of the information. While plaintiff’s counsel has been entirely honorable, and the court in no way intends this remark to reflect upon him, it is appropriate for motion papers to set forth a commitment to honor any limitations the court might establish.
Third, the court must weigh in the decision making any negative impact disclosure might have on the interests of the donor, including testing and treatment. The statute states: "In assessing compelling need and clear and imminent danger, the court shall provide written findings of fact, including scientific or medical findings, citing specific evidence in the record which supports each finding, and shall weigh the need for disclosure against the privacy interest of the protected individual and the public interest which may be disserved by disclosure which deters future testing or treatment or which may lead to discrimination.” (Public Health Law § 2785 [5].) Excluded from this formulation is the impact on subsequent blood donations, which the Center urges is a critical issue. This argument is premised upon the fact that much of the Nation’s blood supply comes from voluntary donations, which is preferred as a source to individuals who sell their blood. Blood banks often claim altruistic volunteer donors would be deterred from donation if they anticipated being subjected to inquiry or involvement in AIDS related litigation. Nonetheless, the New York statute does not recognize the blood supply argument as the relevant policy consideration. Accordingly, the cases which address the impact upon the Nation’s blood supply as a critical factor, either as a reason for nondisclosure, as in Rasmussen v South Fla. Blood Serv. (500 So 2d 533, 536 [Fla 1987]), or find the argument factually unsupported and order disclosure of a donor’s name without limits, as in *133 Sampson v American Natl. Red Cross (139 FRD 95 [ND Tex 1991]), cannot serve as a basis for disposition of this request.[5]
As to what form the discovery might take, the statute creates no special rules relating to admissibility. In the situation present here of the actual donor, it would appear that a deposition must be utilized. Absent a consent to admissibility by the parties, there is no statutory language in the Public Health Law which provides for the use of written questions to maintain confidentiality, which is a device often used by other courts.[6]
The factors discussed above, taken collectively, set a proper analytic framework for disposition of the requests made in the motion. As to the request for an unlimited disclosure of the donor’s name, in the event the donor is alive, with the avowed purpose of deposing the donor about a broad *134 range of topics, that request is denied. Plaintiff has not (1) established the relevance of the proposed inquiry sufficient to show a compelling need for the discovery desired, (2) confined the scope of the disclosure request, (3) professed a willingness to limit access to the information, or (4) offered an argument in relation to the impact of any disclosure order on the donor and the policy of encouraging HIV and AIDS testing and treatment. Accordingly, the request is denied with leave to renew upon proper papers.
The alternate relief sought, in the event that the donor is deceased, of access to the donor’s relatives about the donor’s prior health history, is also denied. Given that only the screening procedures are at issue, a statement from relatives will not shed direct light on that facet of the case.
As to the unopposed requests, they are granted. Defendant is directed forthwith to ascertain whether the donor is alive, and advise plaintiff’s counsel of the result of its investigation. Defendant is to forthwith provide redacted copies of the "look-back” study, the questionnaires filled out by the same donor on the occasions of other donations, and any laboratory reports done on the donor’s blood.
In the event the donor is alive and the motion is to be renewed, the court closes by noting that section 2785 (4) (a) of the Public Health Law does address notice to the individual involved, stating as follows: "The individual * * * shall be given adequate notice of such application in a manner which will not disclose to any other person the identity of the individual, and shall be afforded an opportunity to file a written response to the application, or to appear in person for the limited purpose of providing evidence on the statutory criteria for the issuance of an order pursuant to this section.” (Emphasis added.) This language appears in a context which presupposes that the application for disclosure might contain identifying information not already in the public record and that the file should be sealed and proceedings conducted in camera (Public Health Law § 2785 [3]). Here, this context has not been called into play.
As to such notice to the donor, the court resolves the issue only to a limited extent. The court has been presented with a notice of motion. Had the moving papers been sufficient to raise a question of possible disclosure, the court would have proceeded further, and subsequent steps would have included formulating a manner of service of the papers already before *135 the court and a notice to accompany the papers. However, the papers have not passed muster for the reasons stated above. The court determines that this application, having been declined, need not be served upon the donor, which yields the same result that would have been reached had the papers been presented by way of an order to show cause, which this court would have declined to sign for the same reasons set forth above.
The statute appears to allow at least this degree of flexibility on this score, for the phrase "adequate notice” suggests something other than full notice of every step in an application for disclosure, but still sufficient notice for the donor’s meaningful participation prior to a decision. The court has carefully reviewed the statement of legislative intent, the Governor’s Memorandum of approval, and the statements submitted by the cosponsors of the legislation, Senator Manfred Ohrenstein and Assembly Member Richard N. Gottfried, and found nothing to the contrary.
The court orders that the motion papers be sealed and directs that any further applications be made directly to chambers and be consistent with this decision.

. Roth was appointed administratrix of Bernardo’s estate on December 27. 1989.

. In instances where an entity wishes to release HIV information, prior application to a court is permitted and advisable. This situation appears to arise particularly in relation to health care workers. McBarnette v Feldman (153 Misc 2d, at 633) involved a government agency’s subpoena for records of a dentist who died from complications of AIDS, with the court finding that the patient records were not HIV related records falling under the statute.
Under a Pennsylvania statute seemingly identical to New York’s Public Health Law provisions, in In re Hershey Med. Ctr. (407 Pa Super 565, 595 A2d 1290 [1991]), the court affirmed an order permitting two hospitals to disclose the identity of a physician in their joint residency program and the physician’s HIV-positive status to certain colleagues and to certain patients that an unidentified physician who participated in their surgical procedure or obstetrical care was HIV-positive. After a detailed review of the literature relevant to HIV-infected health care workers, and consideration that the doctor had participated in the care of approximately 400 patients, including a number of surgical procedures, it was found the hospitals had sustained their burden of demonstrating a "compelling need” to disclose the physician’s HIV status. The court’s reference to the Pennsylvania Bar Association and Pennsylvania Medical Society Publication, AIDS, A Medical-Legal Handbook (1991), indicates it might be a useful reference.

. Although decided before the statute, Krygier v Airweld, Inc. (137 Mise 2d 306) remains relevant if there were a doctor-patient privilege to be asserted. There, Justice Levine denied plaintiffs request for the names and addresses of 21 blood donors involved in multiple transfusions, where the blood was drawn by a doctor, an employee of a blood bank. The court considered CPLR 4504 (a), which precludes a doctor from disclosing information received "[u]nless the patient waives the privilege”, and CPLR 3103 (a), which permits a protective order "to prevent unreasonable annoyance * * * embarrassment * * * to any person,” much like the Federal Rules of Civil Procedure, rule 26 (c) reference to "annoyance, embarrassment, oppression, or undue burden or expense,” often invoked by the Federal courts in these cases with the Federal provision having a recognized use of protect privacy and reputation interests (Seattle Times Co. v Rhinehart, 467 US 20, 35, n 21 [1984]).

. (See, Borzillieri v American Natl. Red Cross, supra, 139 FRD, at 290 *131 ["without this information (on the actual screening process), it seems very likely that plaintiffs case may fail for lack of proof’]; compare, Doe v University of Cincinnati, 42 Ohio App 3d 227, 538 NE2d 419 [1988] [denial based on failure to show that information sought could be obtained only from the donor] with Krygier v Airweld, Inc., supra, 137 Misc 2d, at 309 [screening information from multiple donors, not all of whom would be HIV-positive, would have "only marginal utility in advancing the plaintiff’s theory of liability”].) The same standard is applied in cases where the defendant seeks such information from a plaintiff (see, Agosto v Trusswal Sys. Corp., 142 FRD 118 [ED Pa 1992] [in products liability suit unrelated to HIV condition, disclosure directed where plaintiff sought damages for future pain, suffering and lost earning capacity]; Doe v Roe, 151 Wis 2d 366, 444 NW2d 437 [1989] [malpractice claim]).

. Given the involvement of the blood bank, its position must be considered in light of a direct proscription applicable to it against divulging the identity of a blood donor. This restriction appears in 10 NYCRR 58-2.10, which states: "For all collected or distributed human blood * * * the donor’s name, address, telephone number, social security number and any other information which would directly or indirectly identify the blood donor of any specific unit shall not be disclosed by the blood bank to any person or entity except upon the written consent of the donor” (emphasis added). This regulation was promulgated pursuant to Public Health Law § 3121, which regulates blood banks. This public policy of nondisclosure has been repeatedly upheld (see, Matter of New York State Socy. of Surgeons v Axelrod, 77 NY2d 677 [1991]; Anderson v Strong Mem. Hosp., 151 Misc 2d 353 [Sup Ct, Monroe County 1991]; Doe v Roe, 139 Misc 2d 209 [Sup Ct, NY County 1988]; Doe v State of New York, 155 Misc 2d 286).

. (See, Tarrant County Hosp. Dist. v Hughes, 734 SW2d 675, 678-679 [Tex Ct App 1987] [multiple donor case]; Gulf Coast Regional Blood Ctr. v Houston, supra, 745 SW2d 557, 559-560 [Tex Ct App 1988] [multiple donor case]; Belle Bonfils Mem. Blood Ctr. v District Ct., 763 P2d 1003, 1012-1013 [Colo 1988] [written questions, to be directed through the clerk of the court]; Boutte v Blood Sys., 127 FRD 122 [WD La 1989] [written questions, with the defendant’s counsel to make the arrangements]; Stenger v Lehigh Val. Hosp. Ctr., 386 Pa Super 574, 563 A2d 531 [Pa Super Ct 1989]; see also, 525 Pa 620, 577 A2d 891 [1990]; Petition of H. C. S. C. Blood Ctr., 525 Pa 618, 577 A2d 890 [1990]; Petition of Lehigh Val. Hosp. Ctr., 525 Pa 619, 577 A2d 890 [1990] [limited discovery from the blood donor and the results of AIDS tests performed on samples of blood of other recipients, but disallowed disclosure of the identity of the donor and the identities of other recipients of blood from the same donor]; Snyder v Mekhjian, 125 NJ 328, 593 A2d 318 [1991] [per curiam]; see also, LaBurre v East Jefferson Gen. Hosp., 55 So 2d 1381, 1385 [La 1990] [hepatitis, statutory doctor-patient privilege not applicable, redacted donor cards and follow-up questionnaires, without the names and addresses of the individual donors, permitted, without the court taking a negative view of plaintiffs desire to inquire into the sexual history of multiple donors].)