2025 Tex. Bus. 28



## The Business Court of Texas, Third Division

| | | |
|---|---|---|
| SAFELEASE INSURANCE SERVICES LLC, | § § § § | |
| *Plaintiff,* | § | |
| v. | § | Cause No. 25-BC03A-0001 |
| STORABLE, INC., et al., | § § | |
| *Defendants.* | § | |

---

### MEMORANDUM OPINION

---

¶1 On June 23, 2025, the Court issued an order denying the Motion for Partial Reconsideration of the Court's May 28, 2025 Discovery Order (the Motion for Reconsideration) filed by Defendants Storable, Inc.; RedNova Labs d/b/a storEDGE; Sitelink Software, LLC; Easy Storage Solutions, LLC; Bader Co.; and Property First Group, LP (collectively, Storable). This opinion follows.

### Introduction

¶2 In May 2025, the parties filed discovery-dispute letters under Business Court Local Rule 4(d) regarding whether Storable should have to produce

1

documents in response to three requests for production (RFPs), including RFP No. 10, which seeks the names and addresses of Storable Inc.'s customers. The Court ordered production of some of the disputed materials, including the customer information. In the order, the Court noted that Storable had not argued that its customer list was a trade secret. Storable later moved to stay its deadline to produce the customer list and filed this Motion for Reconsideration, asserting for the first time that its customer list is a trade secret. The Court denies the motion because Storable has not shown that it satisfied Rule 193.3(a)'s requirements for preserving the privilege; and even if the customer list is a trade secret, production would be appropriate because SafeLease needs it for a fair adjudication of its antitrust claim and the information is protected from disclosure by the Agreed Protective Order and related rulings in this case.

### The Underlying Dispute

¶3      SafeLease provides tenant insurance for self-storage facilities. To do so, it relies on access to its customers' tenant data that is maintained on facility-management software (FMS). Many of SafeLease's customers license their FMS software from Storable. Storable also has subsidiaries that provide tenant insurance in competition with SafeLease. SafeLease and Storable engaged in sporadic conversations about a potential formal business relationship beginning in 2022, but those conversations broke down in the latter half of 2024. Storable later

removed SafeLease's access to their mutual customers' FMS data, citing security concerns. SafeLease sued Storable in December 2024, claiming that Storable violated state antitrust law by blocking SafeLease's FMS access—more specifically, that Storable is attempting to use its position in the FMS market to obtain monopoly power in the tenant-insurance market.

## Analysis

¶4    This dispute raises two principal questions: (1) Did Storable preserve its new trade-secret-privilege argument? (2) If so, does the trade-secret privilege bar production of Storable's customer list? If the answer to either question is "no," the Court should deny the motion. For the reasons below, the answer to both questions is "no."

## I.    Did Storable preserve its new trade-secret-privilege arguments?

¶5    SafeLease argues the Court should not reconsider its May 28 Order because Storable waived[1] any trade-secret privilege by failing to raise it before the Court's ruling, including in:

- Storable's Objections and Responses to RFP No. 10,

---

[1] The Court focuses on whether Storable "preserve[d]" its privilege as required by Rule 193.3. *See* TEX. R. CIV. P. 193.3. Although "waiver" and "failure to preserve" have overlapping meanings, some distinction may be drawn between rights a party automatically has unless it affirmatively relinquishes them and rights a party loses unless it complies with the requirements to preserve them. For example, the Rules of Appellate Procedure require parties to take certain steps to preserve an appellate issue in the trial court, and failure to comply typically bars a party from raising the issue on appeal, without any separate showing that the party acted intentionally. *See* TEX. R. APP. P. 33.1(a).

- any of the parties' numerous communications regarding their dispute, or

- Storable's discovery letter under Business Court Local Rule 4.[2]

In response, Storable originally argued that it was not required to assert the trade-secret privilege until SafeLease requested a privilege log, which SafeLease had not done.[3] In its reply, Storable argued that its response to RFP No. 10 and discovery letter *did* raise the trade-secret privilege; and even if they did not, it was sufficient to raise the issue in its post-ruling motions for emergency stay and reconsideration.[4]

¶6    The Court holds that (1) Storable has not shown that it asserted the trade-secret privilege or even that its customer list is a trade secret at any time before the Court's ruling, and (2) Storable's assertion of the privilege for the first time in its post-ruling motions does not satisfy Rule 193.3(a). The Court's decision does not depend on Storable's failure to mention the privilege or any trade secret in its discovery-dispute letter under Local Rule 4(d), but the Court also concludes that Storable was on notice that it should raise any arguments

---

[2] Resp. to Mot. for Recons. at 2–4; Resp. to Mot. for Partial Stay of Produc. Deadline at 4–6. Storable asserts that SafeLease offered no evidence to support its waiver argument, but SafeLease put Storable's RFP responses and the parties' related communications into the record as exhibits to its response to Storable's motion for partial stay, where SafeLease first made this waiver argument to this Court. *See* Resp. to Mot. for Partial Stay of Produc. Deadline at Exhs. 1–2. Storable's discovery letter was filed in this Court and is also part of the record.

[3] Reply in Support of Mot. for Partial Stay of Produc. Deadline at 2–3.

[4] Reply in Support of Mot. for Recons. at 2–3.

for resisting discovery in the letter and had both the opportunity and word-space to do so.

### A. Did Storable satisfy Rule 193.3(a)?

¶7     Texas Rule of Civil Procedure 193.3 lays out the procedure by which parties "may preserve a privilege from written discovery."[5] The first step in this process is that the party claiming the privilege "*must* state—in the response (or an amended or supplemental response) or in a separate document—that: (1) information or material responsive to the request or required disclosure has been withheld, (2) the request or required disclosure to which the information or material relates, and (3) the privilege or privileges asserted."[6]

#### 1. Storable had a duty to preserve any trade-secret privilege in compliance with Rule 193.3(a).

¶8     Storable originally argued that it was not required to assert the trade-secret privilege, citing Rule 193.2(f) for the proposition that a party need not object to discovery requests on the basis of privilege.[7] Storable says, "The ordinary procedure under the rules is that Storable may withhold the document, produce a privilege log asserting the privilege (along with any other privileges as to other

---

[5] TEX. R. CIV. P. 193.3.

[6] TEX. R. CIV. P. 193.3(a) (emphasis added).

[7] Reply in Support of Mot. for Partial Stay of Produc. Deadline at 2–3 (citing TEX. R. CIV. P. 193.2(f)).

documents), and SafeLease could challenge any privilege assertions at that time."[8] Thus, Storable contends that it "raised the privilege claim even earlier than it otherwise would have been required to in its briefing on the stay motion and its motion to reconsider the Court's discovery order."[9]

¶9     Storable is correct that a party need not (and should not) object to written discovery based on privilege. But that does not mean that the party has no obligation to let the requesting party know that it is asserting the privilege and withholding documents. Under Rule 193.2(f), "[a] party should not object to a request for written discovery on the grounds that it calls for production of material or information that is privileged *but should instead comply with Rule 193.3*."[10] Storable's argument that it was not obligated to assert the privilege until SafeLease requested a privilege log ignores the first step under Rule 193.3(a), which requires the party asserting the privilege to inform the other party that it is making such an assertion. The request and production of a privilege log is the *next* step: under Rule 193.3(b), *after* the responding party asserts the privilege, the proponent may request a privilege log.[11] Storable had an initial obligation under Rule

---

[8] *Id.* at 2–3 (citing TEX. R. CIV. P. 193.3).

[9] *Id.* at 3.

[10] TEX. R. CIV. P. 193.2(f) (emphasis added).

[11] TEX. R. CIV. P. 193.3(b). This is subject to the exception in part (c), which is not at issue here.

193.3(a) to inform SafeLease that it intended to withhold the customer list based on the trade-secret privilege.

¶10    Importantly, this is neither an instance where a privileged document was inadvertently produced nor a situation where the request for discovery was so overbroad that the respondent could not reasonably be expected to comply with Rule 193.3. The comments to Rule 193.3 indicate that one reason the privilege may be asserted for the first time in a supplemental or amended response is that parties are not intended to assert the privilege prophylactically, and instead, parties producing a large number of documents should amend their responses when they discover a responsive document that triggers a privilege.[12] The same is true even if the party inadvertently produces a privileged document and only discovers that it has done so after the fact.[13] But here, the parties' briefing demonstrates that both sides expect the response to RFP No. 10 to consist of one thing: Storable's FMS customer list. Under these circumstances, if Storable believed that list was a trade secret and privileged from production, it is difficult to see why Storable never mentioned that to anyone before the Court's ruling.

¶11    Case law confirms that Storable had a duty to preserve its privilege under Rule 193.3. For example, in *In re Anderson*, the San Antonio Court of Ap-

---

[12] TEX. R. CIV. P. 193.3(d) & cmt. 3.

[13] TEX. R. CIV. P. 193.3(d) & cmt. 4.

peals granted a conditional mandamus requiring the trial court to compel production of a legal memorandum because the defendant had not complied with Rule 193.3(a).[14] The defendant had not disclosed in its discovery responses that it was withholding a document based on privilege.[15] When the plaintiff later discovered the document's existence, the defendant asserted the attorney-client privilege for the first time in a deposition objection and later in a letter refusing production.[16] The trial court denied the motion to compel,[17] but the court of appeals held that this was error because the defendant failed to preserve the privilege under Rule 193.3(a).[18] The facts of this case are similar, except that here Storable waited even later to assert its putative privilege and never did so in the course of discovery.

¶12    Similarly, in *In re Soto*, the defendant requested production of an authorization for release of certain medical records, and the plaintiffs' responses did not assert a privilege or state they were withholding documents responsive to the request.[19] The Amarillo Court of Appeals upheld the trial court's order requiring production, pointing out that the plaintiffs had not raised an objection or

---

[14] 163 S.W.3d 136, 142 (Tex. App.—San Antonio 2005, orig. proceeding).

[15] *Id.* at 139.

[16] *Id.*

[17] *Id.*

[18] *Id.* at 142 ("Because the City failed to assert its privilege in accordance with rule 193.3(a), the trial court erred in denying Anderson's motion to compel production of the memorandum.").

[19] *In re Soto*, 270 S.W.3d 732, 733–34 (Tex. App.—Amarillo 2008, orig. proceeding).

8

assertion of privilege in compliance with Rule 193.2(a) or 193.3(a).[20] Likewise, the Dallas Court of Appeals held in *In re Hardisty* that plaintiffs waived various privileges asserted with respect to certain records when they failed to comply with Rule 193.3(a).[21]

### 2. Storable did not satisfy Rule 193.3(a) before the Court's ruling.

¶13    In its reply, Storable argues that it asserted the trade-secret privilege in its RFP responses by objecting that RFP No. 10 sought "confidential, proprietary, and commercially sensitive information of the highest degree."[22] But Rule 193.3(a) requires three pieces of information: that responsive material is being withheld, to which RFP the withheld material is responsive, and which privilege the party asserts.[23] The statement Storable relies on does not specify that Storable is withholding documents responsive to RFP No. 10 based on privilege or identify the trade-secret privilege as the basis of that withholding. It therefore does not

---

[20] *Id.* at 734–35.

[21] *In re Hardisty*, No. 05-00-01080-CV, 2000 WL 1160683, at *1 (Tex. App.—Dallas Aug. 17, 2000, orig. proceeding).

[22] Reply in Support of Mot. for Recons. at 2 (citing Exh. B thereto).

[23] TEX. R. CIV. P. 193.3(a)(1)–(3); *see also, e.g.*, *In re Living Ctrs. of Tex., Inc.*, 175 S.W.3d 253, 261 (Tex. 2005) (orig. proceeding) ("A party may assert a privilege by withholding documents and stating in its response to a discovery request: '(1) information or material responsive to the request has been withheld, (2) the request to which the information or material relates, and (3) the privilege or privileges asserted.'" (quoting TEX. R. CIV. P. 193.3(a)); *In re Brookfield Infrastructure Grp., LLC*, No. 13-17-00486-CV, 2018 WL 1725467, at *9 (Tex. App.—Corpus Christi–Edinburg Apr. 9, 2018, orig. proceeding) ("If a party chooses to withhold, then that party must disclose that responsive material has been withheld, identify the requests to which the material is responsive, and identify the privilege or privileges asserted.").

satisfy Rule 193.3(a). For the same reasons, Storable did not satisfy Rule 193.3(a) simply by stating in its discovery-dispute letter to this Court that its customer list is "highly confidential."[24]

### 3. Storable's post-ruling motions did not satisfy Rule 193.3(a).

¶14     Storable also argues in its reply that Rule 193.3(a) allows a responding party to assert the privilege in a "separate document," and that Storable did so by asserting the privilege in its post-ruling motions.[25] But Storable cites, and the Court has found, no authority for the proposition that parties can satisfy Rule 193.3(a) by arguing privilege for the first time in post-ruling motions. It is not clear what purpose Rule 193.3(a) could serve if that were the case.

¶15     The Court does not construe the phrase "separate document" in Rule 193.3(a) to mean any document of any kind under any circumstances. While the Court will not read additional words or requirements into this language, it must read the language in context rather than viewing the words in isolation or giving them a hyperliteral meaning.[26] As the Texas Supreme Court has observed,

---

[24] Storable's Discovery-Dispute Ltr. at 1.

[25] Reply in Support of Mot. for Recons. at 2.

[26] *See, e.g.*, *Pub. Util. Comm'n of Tex. v. Luminant Energy Co.*, 691 S.W.3d 448, 460–61 (Tex. 2024) (explaining that statutory text "must always be read 'in context—not isolation'" and Texas courts "take statutes as we find them" (quoting *State v. Hollins*, 620 S.W.3d 400, 407 (Tex. 2020) (per curiam) and *Union Carbide Corp. v. Synatzske*, 438 S.W.3d 39, 52 (Tex. 2014))); *In re Dallas County*, 697 S.W.3d 142, 158 (Tex. 2024) (orig. proceeding) ("[W]e must tether ourselves 'to the *fair meaning* of the text,' not 'the hyperliteral meaning of each word in the text.'" (quoting Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 356 (2012))); *Univ. of Tex. at Arlington v. Williams*, 459 S.W.3d 48, 52 (Tex. 2015) ("[C]ontext is

"[c]ontextual reading yields the text's 'fair meaning,' our interpretive North Star."[27] Under a hyperliteral interpretation of "separate document," a party could simply write an assertion of privilege on a sheet of paper, shove that sheet of paper in a desk drawer where no one else would see it, and satisfy Rule 193.3(a). But that is not a fair or reasonable reading of the Rule.

¶16     Read in context, "separate document" in Rule 193.3(a) refers to a document exchanged among the parties in the course of discovery. Rule 193 is in Part II, Section 9, Subsection B of the Texas Rules of Civil Procedure, which are the rules governing discovery. Rule 192 addresses what discovery a par-ty can seek and how to seek it, and Rule 193 addresses what a party can do in response to written discovery and potential consequences.[28] Rule 193.3 addresses how a party can "preserve a privilege from written discovery," and relates to actions that occur during discovery among the parties: withholding privileged doc-uments from production,[29] requesting and providing a privilege log,[30] and clawing back inadvertently produced privileged documents.[31] This is distinguishable from

---

fundamental to understanding the use of language and that meaning cannot ordinarily be drawn from isolated words or phrases but must typically be determined from statutory context." (citing *TGS–NOPEC Geophysical Co. v. Combs,* 340 S.W.3d 432, 439 (Tex. 2011))).

[27] *Kelley v. Homminga*, 706 S.W.3d 829, 832 (Tex. 2025) (per curiam).

[28] *See* TEX. R. CIV. P. 192–93.

[29] TEX. R. CIV. P. 193.3(a), (c).

[30] TEX. R. CIV. P. 193.3(b), (c).

[31] TEX. R. CIV. P. 193.3(d).

11

Rule 193.4, which addresses actions that involve court intervention in disputes arising out of discovery.[32]

¶17    In addition to this overarching context, "separate document" must be read in context of the sentence in which it is used and the sentences around it. The sentence as a whole evidences a specific purpose: to inform the requesting party that the responding party is withholding responsive documents based on privilege, to which request the withheld documents are responsive, and on which privilege the responding party relies.[33] The next sentence, subpart (b), demonstrates the purpose of this notice is to enable the requesting party to promptly investigate the privilege assertion through a privilege log.[34] Subpart (b) contemplates that the document in which privilege is asserted will be part of the documents the responding party sends in response to written discovery: "[a]fter receiving a response indicating that material or information has been withheld from production … ."[35]

---

[32] TEX. R. CIV. P. 193.4.

[33] TEX. R. CIV. P. 193.3(a) ("The party must state—in the response (or an amended or supplemental response) or in a separate document—that: (1) information or material responsive to the request or required disclosure has been withheld, (2) the request or required disclosure to which the information or material relates, and (3) the privilege or privileges asserted.").

[34] TEX. R. CIV. P. 193.3(b) (providing that once privilege is asserted, party can request privilege log, which responding party must provide within 15 days of request).

[35] *Id.* Moreover, if the Rule's drafters intended that privilege could be asserted in any document under any circumstances, it would be odd indeed to mandate that the required privilege information be "in the response (or an amended or supplemental response) or in a separate document," instead of saying "in writing" or "in any document." And many such documents would not serve Rule 193.3(a)'s notice objective.

12

¶18    Finally, the phrase "separate document" must be read in context with the other words it is grouped with in the sentence. Rule 193.3(a) includes "separate document" as one of several kinds of documents in which a party can preserve a discovery privilege.[36] This includes four categories of documents: the response, an amended response, a supplemental response, or a "separate document."[37] The doctrine of *ejusdem generis*—which the Texas Supreme Court has applied when construing the Texas Rules of Civil Procedure[38]—dictates that when a broad, general type or category of thing is referenced along with more specific types or categories, the general term should be constrained by the more specific terms.[39] Consistently, the Texas Supreme Court has "warned against expansively interpreting broad language where it is immediately preceded by narrow and specific terms."[40] Thus, "separate document" under Rule 193.3 is limited to documents that are similar in nature to the types of documents listed: an original, amended, or

---

[36] TEX. R. CIV. P. 193.3(a).

[37] *Id.*

[38] *In re Millwork*, 631 S.W.3d 706, 712 (Tex. 2021) (orig. proceeding) (per curiam) (interpreting Rule 199.3).

[39] *See, e.g.*, *Williams*, 459 S.W.3d at 52; *Ross v. St. Luke's Episcopal Hosp.*, 462 S.W.3d 496, 504 (Tex. 2015); *R.R. Comm'n of Tex. v. Tex. Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 629 (Tex. 2011); *Marks v. St. Luke's Episcopal Hosp.*, 319 S.W.3d 658, 662–63 (Tex. 2010) (plurality op.).

[40] *R.R. Comm'n*, 336 S.W.3d at 629 (citing *Marks*, 319 S.W.3d at 663).

supplemental discovery response.[41] These are all documents exchanged among the parties in the course of responding to written requests for discovery.

¶19    Thus, the inclusion of "a separate document" in Rule 193.3(a) means that the assertion of privilege need not be included in the response (or the amended or supplemental response) itself and can instead be included in a "separate document" that the responding party likewise sends to the requesting party as part of the process for responding to a request for written discovery.[42]

### 4. Conclusion

¶20    At the time the Court ordered production of the customer list, Storable had never asserted that it was entitled to withhold the customer list under the trade-secret privilege, that the customer list was a trade secret, or that the customer list was privileged. As far as the evidence in the record shows, Storable still has not supplemented or amended its discovery responses or served any other document in discovery to assert the privilege. And the Court concludes that raising the privilege only in post-ruling motions does not satisfy Rule 193.3(a). The Court thus holds that, with respect to its FMS customer list, Storable has not preserved a trade-secret privilege.

---

[41] TEX. R. CIV. P. 193.3(a).

[42] *See, e.g.*, *Marks*, 319 S.W.3d at 663–64 (rejecting expansive reading of "safety" in statutory definition of "health care liability claim" and interpreting it consistent with other aspects of statute).

## B. Did Local Rule 4(d) impede Storable's ability to raise the trade-secret privilege before the Court's ruling?

¶21 Storable implies that it wanted to raise trade-secret privilege in its discovery-dispute letter but was prevented from doing so by the "strict" word limit applicable to such letters under the local rules.[43] But the word limit for discovery letters is 700 words, and Storable's letter was only 609 words.[44] Storable had nearly 100 unused words with which it could have asserted that its customer list was a trade secret or privileged or even mentioned Rule 507. As SafeLease points out, "it takes only six words to say, 'The requested documents are trade secrets.'"[45]

¶22 Storable also refers to the letters as "pre-motion letters" and implies that it did not expect the parties' discovery dispute to be resolved without further briefing. But Local Rule 4(d) expressly advises parties that the Court may decide the discovery dispute based on the letters alone, without further briefing.[46] The purpose of Local Rule 4(d) is to enable a faster and less costly resolution of discovery issues when practicable. It is designed to increase efficiency by eliminating unnecessary work and delay, not to increase red tape and wait times by simply appending an additional procedural hoop to the process.

---

[43] BUS. CT. LOC. R. 4(d).

[44] *Id.*

[45] Resp. to Mot. for Partial Stay of Produc. Deadline at 5.

[46] BUS. CT. LOC. R. 4(d).

¶23 Storable cannot legitimately complain that it should have been afforded the opportunity to fully brief its trade-secret contention when it failed to raise that issue at all and did not request further briefing or argue that it was needed—despite having the opportunity (and word space) to do so and despite being fully aware that the Court could rule based on the discovery-letters alone.

¶24 The Court does not conclude that a party necessarily waives an argument by failing to raise it in a discovery-dispute letter under Local Rule 4. But a party who loses cannot typically come back after the fact and raise new arguments that it could have and should have raised in the first instance—at least not without a good reason. Regardless, the Court need not decide whether to allow a second bite at the apple here because, as discussed above, Storable did not preserve its asserted trade-secret privilege under Rule 193.3(a).

## C. Conclusion

¶25 Storable has not shown that it complied with Rule 193.3(a) or took any action to assert a trade-secret privilege before the Court's ruling on May 28, 2025—or even that it has satisfied Rule 193.3(a) now. Nor has it shown a valid justification. These circumstances are a sufficient basis for denial of the Motion for Reconsideration[47]—and in fact, granting the motion could be an abuse of discre-

---

[47] *See In re Michelin N. Am., Inc.*, No. 05–15–01480–CV, 2016 WL 890970, at *8 (Tex. App.—Dallas Mar. 9, 2016, orig. proceeding) (holding trial court could not have abused its discretion by failing to treat financial information as protected under trade-secret privilege when party did not offer trade-secret evidence until after submission). The *Michelin* court notes that parties "cannot

16

tion.[48] The Court is reluctant to dispose of this motion based on waiver but also cognizant that it may not have discretion to enforce a privilege that was not preserved under the Rules. Ultimately, the Court need not rest its decision solely on this ground because the Court would also deny the Motion for Reconsideration on the merits, as discussed below.[49]

## II.   Does the trade-secret privilege bar production?

¶26   Storable asserts that its customer list is a trade secret privileged under Texas Rule of Evidence 507.[50] The Texas Supreme Court has outlined the following procedure for trial courts to apply Rule 507:

> First, the party resisting discovery must establish that the information is a trade secret. The burden then shifts to the requesting party to establish that the information is necessary for a fair adjudication of its claims. If the requesting party meets this burden, the trial court should ordinarily compel disclosure of the information, subject to an appropriate protective order. In each circumstance, the trial court

---

marshal [their] defenses consecutively and present them to the court for ruling, one by one. Once a party has had the opportunity to present his defenses, a trial court need not protract the dispute by extending further opportunities." *Id.* (quoting *Elec. Data Sys. Corp. v. Tyson*, 862 S.W.2d 728, 736 n.5 (Tex. App.—Dallas 1993, orig. proceeding)); *see also J.K. & Susie L. Wadley Rsch. Inst. & Blood Bank v. Whittington*, 843 S.W.2d 77, 87 n.9 (Tex. App.—Dallas 1992, orig. proceeding [leave denied]) ("[A] party cannot drag out the discovery process by taking all the procedural steps necessary to protect records from discovery, one by one, and each one only after it has received an adverse ruling from the trial court after the earlier steps.").

[48] *See, e.g.*, *In re Anderson*, 163 S.W.3d at 139–42.

[49] The Court notes that even though Storable has not preserved a privilege from production under Rule 507, its customer list may still be a trade secret entitled to other protections, including under the Agreed Protective Order, Rule 76a, or any applicable statutes.

[50] TEX. R. EVID. 507(a) ("A person has a privilege to refuse to disclose and to prevent other persons from disclosing a trade secret owned by the person, unless the court finds that nondisclosure will tend to conceal fraud or otherwise work injustice.").

must weigh the degree of the requesting party's need for the information with the potential harm of disclosure to the resisting party.[51]

¶27    For the reasons below, even if Storable had preserved a trade-secret privilege, the Court would still have concluded that production of the customer list is appropriate under the facts of this case.

## A.  Is Storable's customer list a trade secret?

¶28    The first step is determining whether Storable's customer list is a trade secret. Customer lists can, and often do, qualify as a trade secret.[52] But they are not inherently trade secrets—customer lists that are not secret and offer no competitive advantage do not qualify.[53] Storable bears the burden of proving that its customer list is a trade secret[54] and has presented evidence that is largely uncontroverted.

¶29    SafeLease contests one element of Storable's trade-secret showing. It argues that Storable's customer list cannot qualify as a trade secret because it does

---

[51] *In re Cont'l Gen. Tire, Inc.*, 979 S.W.2d 609, 613 (Tex. 1998) (orig. proceeding); *see also In re Union Pac. R. Co.*, 294 S.W.3d 589, 591–92 (Tex. 2009) (orig. proceeding) (per curiam).

[52]    *See In re C-Automation, Inc.*, 698 S.W.3d 87, 98 (Tex. App.—Houston [14th Dist.] 2024, orig. proceeding); *Sharma v. Vinmar Int'l, Ltd.*, 231 S.W.3d 405, 425 & n. 14 (Tex. App.—Houston [14th Dist.] 2007, no pet.); *see also* TEX. CIV. PRAC. & REM. CODE § 134A.002(6) (listing customer lists among types of information that is trade secret under TUTSA if statutory criteria are met).

[53] *E.g.*, *Bluebonnet Petroleum, Inc. v. Kolkhorst Petroleum Co.*, No. 14-07-00380-CV, 2008 WL 4527709, at *6 (Tex. App.—Houston [14th Dist.] Oct. 9, 2008, pet. denied); *Sands v. Estate of Buys*, 160 S.W.3d 684, 690–91 (Tex. App.—Fort Worth 2005, no pet.); *Numed, Inc. v. McNutt*, 724 S.W.2d 432, 435 (Tex. App.—Fort Worth 1987, no writ); *see also Trilogy Software, Inc. v. Callidus Software, Inc.*, 143 S.W.3d 452, 466–67 (Tex. App.—Austin 2004, pet. denied); *Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459, 467–68 (5th Cir. 2003) (collecting cases).

[54] *See In re Bass*, 113 S.W.3d 735, 737 (Tex. 2003) (orig. proceeding).

not have independent economic value to Storable's competitors. SafeLease relies on case law that "[a] customer list presents no advantage to competitors when the customers belong to a 'well-defined' and 'readily ascertained class.'"[55] As one federal court put it:

> [T]he *sine qua non* of whether a customer list constitutes a trade secret lies in whether "the customers are readily ascertainable outside the employer's business as prospective users or consumers of the employer's services or products," or, by contrast, "the customers are not known in the trade or are discoverable only by extraordinary efforts [and the] customers' patronage had been secured by years of effort and advertising effected by the expenditure of substantial time and money."[56]

¶30    Texas courts have acknowledged that customer lists typically are not trade secrets when potential customers are a readily ascertained class. For example, the Houston 14th Court of Appeals held that the customer list of a wholesale distributor of API-6A oilfield equipment was not a trade secret because "the names of buyers of API-6A products are not secret" and "[e]verybody can log on [the] Internet to []find out the company names."[57] Similarly, the San Antonio Court of Appeals rejected the plaintiff's argument that its customer list was a trade secret

---

[55] Resp. to Mot. for Recons. at 6 (quoting *Rsch. Equip. Co. v. C.H. Galloway & Sci. Cages, Inc.*, 485 S.W.2d 953, 956 (Tex. App.—Waco 1972, no writ); *SCM Corp. v. Triplett Co.*, 399 S.W.2d 583, 587 (Tex. App.—San Antonio 1966, no writ)); *see also Numed*, 724 S.W.2d at 435 (finding business engaged in selling and leasing diagnostic imaging equipment could readily obtain customer lists by calling doctors and hospital administrators).

[56] *Poller v. BioScrip, Inc.*, 974 F. Supp. 2d 204, 216 (S.D.N.Y. 2013) (quoting *Leo Silfen, Inc. v. Cream,* 278 N.E.2d 636, 639 (N.Y. 1972)), *recons. granted on other grounds*, 11 Civ. 1675 (JPO), 2014 WL 13109132 (Apr. 14, 2014).

[57] *Kana Energy Servs., Inc. v. Jiangsu Jinshi Mach. Grp. Co.*, 565 S.W.3d 347, 355 (Tex. App.—Houston [14th Dist.] 2018, no pet.).

because its customers were "readily ascertainable" and could be determined by contacting prospective customers in the class and asking who they used.[58] And the Dallas Court of Appeals held that a customer list was not a trade secret when prospective customers could be found in a state manufacturers' guide and customers were free to disclose with whom they did business.[59] Further, the Waco Court of Appeals held in a misappropriation-of-trade-secret case that a party's customer list "was not of great significance" because customers in the industry (fabrication of animal cages for medical and research facilities) were a well-defined, ascertainable class.[60] SafeLease argues that Storable's FMS customers also come from a readily ascertainable class: self-storage facilities. SafeLease points out that self-storage facilities can be looked up on the internet, and at least one company, SpareFoot,

---

[58] *SCM Corp.*, 399 S.W.2d at 586. Here too, the parties seem to agree that the customers themselves are free to disclose who their FMS provider is. Mot. for Reconsideration at 8. This is meaningful in light of the testimony from multiple witnesses at the TI hearing that the self-storage industry is small and tightknit and that the people in the industry "all talk." 2.13.2025 TI Tr. at 228:3–11; *see also* 2.14.2025 TI Tr. at 56:8–12, 144:21-145:3. At a minimum, all of SafeLease's customers who are also customers of Storable—approximately 70% of SafeLease's customers—have already shared this information with SafeLease. 2.14.2025 TI Tr. at 28:17–21.

[59] *Mfrs. Consol. Serv., Inc. v. McFadden*, No. 05-91-00227-CV, 1991 WL 214475, at *3 (Tex. App.—Dallas Oct. 14, 1991, no writ).

[60] *Rsch. Equip.*, 485 S.W.2d at 956. Relatedly, the Texas Supreme Court held in *DeSantis v. Wackenhut Corp.* that a noncompete agreement was unenforceable because Wackenhut failed to show it was necessary to protect a valid business interest. 793 S.W.2d 670, 675, 684 (Tex. 1990). The Court recognized that trade secrets and other confidential information are protectable interests, *id.* at 682, but rejected Wackenhut's reliance on the identities of its customers as a protectable interest because Wackenhut "failed to show that its customers could not readily be identified by someone outside its employ, that such knowledge carried some competitive advantage, or that its customers' needs could not be ascertained simply by inquiry addressed to those customers themselves," *id.* at 684.

has a public website that locates self-storage facilities.[61] Thus, while Storable says its FMS customer list would provide a competitor with "thousands of potential customer leads,"[62] SafeLease argues those leads are not valuable to competitors because they already know who their prospective customers are: self-storage facilities.

¶31 Ultimately, the Court need not resolve this dispute because the result is the same either way. As detailed below, even assuming Storable's customer list is a trade secret, production of the customer list is necessary for the fair adjudication of SafeLease's claims, and the Agreed Protective Order and the Court's subsequent rulings provide adequate protection against disclosure.

**B. Is the customer list necessary for the fair adjudication of SafeLease's claims?**

¶32 If a party asserting trade-secret privilege proves that the information is a trade secret, "[t]he burden then shifts to the requesting party to establish that the information is necessary for a fair adjudication of its claims."[63] To satisfy this burden, SafeLease must establish that the information is "material and necessary to the litigation,"[64] "weighing [SafeLease's] need for the information against the

---

[61] Resp. to Mot. for Recons. at 8.

[62] Mot. for Recons., Gordon Decl., ¶ 9.

[63] *Cont'l Gen. Tire*, 979 S.W.2d at 613; *see also Union Pac.*, 294 S.W.3d at 592; *Bass*, 113 S.W.3d at 738.

[64] *Bass*, 113 S.W.3d at 743 (quoting *Cont'l Gen. Tire*, 979 S.W.2d at 615).

potential of harm to [Storable] from disclosure."[65] SafeLease must show that denial of the information will result in a "real, rather than merely possible" threat to its ability to present the case on the merits.[66]

### 1. Storable has shown a need for the customer information.

¶33    SafeLease argues that Storable's FMS customer list is "essential to a fair resolution of the lawsuit"[67] because its antitrust claim is premised on the theory that Storable is attempting to leverage its monopoly in the FMS industry to gain a monopoly in the tenant-insurance industry. This is consistent with the evidence the parties presented at the TI hearing, where (1) much of the testimony and exhibits focused on showing that Storable had monopoly power in the FMS market,[68] (2) the parties hotly contested how many FMS customers Storable had,[69] (3) the parties' experts disagreed over which customers should be included in the relevant FMS market and how market share should be calculated based on those customers,[70] and (4) both sides presented evidence on the whether access to Storable's

---

[65] *In re Bridgestone/Firestone, Inc.*, 106 S.W.3d 730, 732 (Tex. 2003) (orig. proceeding) (citing *Cont'l Gen. Tire*, 979 S.W.2d at 609, 610–13).

[66] *Union Pac.*, 294 S.W.3d at 592–93 (quoting *Bridgestone/Firestone*, 106 S.W.3d at 732–33 and citing *Bass*, 113 S.W.3d at 743).

[67] Resp. to Mot. for Recons. at 8 (quoting *In re Valero Ref.-Tex., LP*, No. 01-14-00149-CV, 2014 WL 4115917, at *3-4 (Tex. App.—Houston [1st Dist.] Aug. 21, 2014, orig. proceeding).

[68] *See, e.g.*, 2.11.2025 TI Tr. at 114–25; 2.13.2025 TI Tr. at 106–07.

[69] *See* notes 76–80, *infra*.

[70] *See, e.g.*, 2.13.2025 TI Tr. at 119:21–120:10, 207:18–22.

FMS systems was essential to SafeLease's ability to provide its insurance services to the parties' shared customers.[71]

¶34   There are numerous antitrust cases in which a defendant's position in one market was an important aspect of a plaintiff's claim against the defendant for monopolization or attempted monopolization of another market. For example, when an antitrust claim is based on an "essential facilities," "refusal to deal," or "monopoly leveraging" theory, the plaintiff must show the defendant had a monopoly in one market or over an essential facility and used that power to exclude competition in the market in which the plaintiff competes.[72] And in fact, a defendant's customers in one market have been used to define the relevant market for plaintiff's antitrust claims in another market.[73] These are exactly the types of theories SafeLease has asserted in this case, as underscored by Storable's motion for partial summary judgment, which addresses the viability of such theories under

---

[71] *See, e.g.*, 2.11.2025 TI Tr. at 254:12–20, 280:2–8, 296:6–15, 319:14–320:8; 2.13.2025 TI Tr. at 74:19–21, 92:24–93:2, 101:13–18; 2.14.2025 TI Tr. at 18:2–26:15, 121:13–123:9, 149:10–21.

[72] *See, e.g.*, WILLIAM HOLMES & MELISSA MANGIARACINA, *Monopoly leveraging; essential facilities doctrine*, ANTITRUST LAW HANDBOOK § 3:10–12; JUSTIN LAMSON, *Willful acquisition or maintenance of monopoly power—Limited exceptions: Safe harbors—Unilateral refusals to deal with competitors—Unilateral monopoly leveraging*, 1 ANTITRUST ADVISER § 2:19 (Irving Scher & Scott Martin eds., 5th ed.); WILLIAM C. HOLMES, *Monopoly leveraging*, 1 HOLMES, INTELLECTUAL PROPERTY AND ANTITRUST LAW § 6:9; WILLIAM C. HOLMES, *Unilateral refusals to supply component parts, materials or services*, 2 HOLMES, INTELLECTUAL PROPERTY AND ANTITRUST LAW § 11:3.

[73] *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482–86 (1992) (using owners of Kodak industrial copiers as relevant market for plaintiff's attempted-monopolization claim and holding plaintiff stated viable claim that Kodak attempted to monopolize market for repair services for Kodak copiers by using its monopoly over manufacture of component parts to cut off third-party providers' access to Kodak copier parts).

the facts of this case.[74] Whether SafeLease can prevail under such a theory is yet to be determined, but SafeLease has demonstrated that it needs the information it seeks for a fair opportunity to present its case.

### 2. Storable's offer to provide the total number of its FMS customers does not satisfy this need.

¶35     Storable argues SafeLease does not need its FMS customer list because Storable offered to provide SafeLease with the total number of FMS facilities it services. SafeLease responds that it should not have to take Storable's word for it and should be afforded access to the underlying customer data. Storable disagrees and points out that SafeLease was satisfied with relying on an estimate of the number of customers at the TI hearing "without complaint."[75]

¶36     The Court agrees with SafeLease on this issue for several reasons. First, parties typically are not required to take an opposing party's word for it in litigation. Litigation is adversarial by nature, and a principal purpose of discovery is to allow parties to uncover evidence that may disprove another party's contentions in the case. SafeLease generally is not required to trust Storable's say-so without seeking proof, and both Storable and SafeLease have demonstrated a deep distrust of each other throughout this litigation.

---

[74] Mot. for Partial Summ. J. (hereafter, MPSJ) at 8, 10, 13, 16–21.

[75] Mot. for Recons. at 8.

¶37    Second, the fact that a party relies on the best evidence available at the time of the TI hearing should not prevent the party from seeking to discover better, additional evidence for use at trial.

¶38    Third, the parties' dispute at the TI hearing over the actual number of Storable's FMS customers demonstrates why it is important for SafeLease to be able to verify the data. SafeLease presented evidence at the TI hearing that the number of customers SafeLease used to calculate Storable's share of the FMS market (36,000 facilities) was taken from Storable's website at the outset of the case.[76] Shortly after suit was filed, when SafeLease deposed Gordon as Storable's corporate representative, he testified that Storable had 33,000 facilities as FMS customers.[77] Then at the TI hearing, Storable's expert testified that Storable had 30,000 FMS customers.[78] According to SafeLease, Storable likewise changed its website a few days before the TI hearing to show a lower number of FMS customers.[79] These varying accounts all occurred in a short time frame around the time this litigation began. At the hearing, SafeLease's reliance on the original number from Storable's own website was not "without complaint"—*Storable* attacked it,

---

[76] 2.11.2025 TI Tr. at 120; Resp. to Mot. for Recons. Exh. 4; TI Tr. Exh. PX185.

[77] Resp. to Mot. for Recons. Exh. 5 at 15:20–22.

[78] *See* 2.13.2025 TI Tr. at 119:9–20; Resp. to Mot. for Recons. Exh. 6.

[79] *See* 2.13.2025 TI Tr. at 200, 207.

asserting that the number was incorrect.[80] In light of all of this, SafeLease has a reasonable basis for wanting to ascertain the number of FMS customers for itself. This protects everyone against the recurrence of similar issues at trial.

¶39 Fourth, at the TI hearing, the parties' experts disputed not only the number of Storable's FMS customers but also the parameters of the relevant FMS market—for example, whether it should include only U.S. customers and whether market share should be measured on a per-facility basis or on a per-unit basis.[81] Providing SafeLease with the underlying customer list gives it the ability to be dynamic in determining how it measures the market and responds to counterproposals.

¶40 Fifth, as discussed below, having the FMS customer identities enables SafeLease to conduct other discovery in response to the summary-judgment motion.

### 3. Storable's offer to allow a third party to view the customer list while it remains in Storable's possession also does not satisfy the need.

¶41 Next, Storable argues that SafeLease should be satisfied by its offer to allow SafeLease's expert or a neutral third party to view the customer list while it remains in Storable's possession, which Storable contends is sufficient to enable SafeLease to verify the customer data. As Storable itself points out, verification of

---

[80] *See, e.g., id.* at 119–22, 200–05, 207.

[81] *See, e.g.,* 2.13.2025 TI Tr. at 119:21–120:10, 128:1–133:9, 207:18–22.

the customers in the customer list—whether done across the board, with random sampling, or otherwise—is likely to be a substantial process that cannot be accomplished from merely viewing the list.[82] This is even more true if SafeLease needs to evaluate customers according to submarkets (such as U.S. or foreign customers) or to investigate the accuracy of any per-unit calculations performed by Storable's expert. Moreover, under the Agreed Protective Order in this case—and as the Court noted in its original Order—Storable can designate the customer list as "Outside Counsel's Eyes Only" to limit access to the list to SafeLease's experts and attorneys of record in this case. [83] And the Court has further excluded Mr. Locke from viewing the customer list specifically.[84]

### 4. Storable's pending motion for partial summary judgment illustrates why SafeLease needs the customer list.

¶42    Finally, Storable argues it should not have to produce its FMS customer list because it is only relevant to SafeLease's antitrust claim, and Storable has moved for summary judgment on that claim. SafeLease responds that Storable should not be able to prevent SafeLease from discovering the evidence necessary to support its antitrust claim by moving for summary judgment on that claim. The Court agrees with SafeLease on this point. While some motions for traditional

---

[82] Mot. for Recons. at 8–9.

[83] Agreed Protective Order at ¶¶ 3, 5–6.

[84] Order on Mots. for Recons.; Other Relief, dated June 23, 2025, at ¶ 2.

summary judgment do not implicate any disputed facts, Storable's summary-judgment motion is not such a motion.[85] Instead, it is the kind of summary-judgment motion for which evidence may be relevant—as is demonstrated by the fact that the motion repeatedly asserts that SafeLease has "no evidence" or "zero evidence" on various points[86] and argues that Storable is entitled to summary judgment because SafeLease "cannot present evidence creating a fact issue" on its antitrust claim.[87]

¶43 For example, Storable argues extensively that it is entitled to summary judgment on SafeLease's antitrust claim because SafeLease has not shown, and cannot show, that its conduct affected any other tenant-insurance providers or the tenant-insurance market generally.[88] One way for SafeLease to seek

---

[85] Storable represented to the Court that its motion is a motion for traditional summary judgment and not a motion for no-evidence summary judgment. Reply in Support of Mot. for Partial Stay of Produc. Deadline at 2. The Court accepts this representation and will treat the motion as a motion for traditional summary judgment.

[86] MPSJ at 3, 13, 15, 23–24.

[87] *Id.* at 11.

[88] *Id.* at 13 ("[N]o evidence or further discovery could show that Storable has even attempted to exclude any other tenant insurance companies."); *id.* ("There is no evidence that Storable's conduct affected any tenant insurance competitor … . No further discovery would provide such evidence."); *id.* at 14 ("SafeLease has not adduced any evidence showing that Storable's allegedly exclusionary conduct harmed tenant insurance competition market-wide or affected any competitor apart from SafeLease."); *id.* at 15 ("There is no evidence that the many other tenant insurance providers are not competitive or that Storable's conduct had any market-wide effect—and no further discovery could show this."); *id.* ("This history and the lack of evidence that any tenant competitor apart from SafeLease has been or will be harmed by Storable dooms SafeLease's antitrust claim."); *id.* at 23 ("The only allegation SafeLease musters related to this prong is its conclusory claim that Storable is trying to 'drive out as many competitors in the tenant insurance market as it can.' But no evidence supports this claim."); *id.* at 24 ("There is no evidence and no further discovery could show that Storable had an intent to destroy competition in the tenant in-

28

evidence to controvert Storable's assertions and support its own would be to conduct discovery on other Storable FMS customers to determine whether their insurance providers were denied FMS access or whether Storable otherwise limited their insurance provider options. Likewise, SafeLease could seek discovery from these customers to identify their insurance providers, then seek discovery from those insurance providers about how Storable's conduct has impacted them, if at all. To do that, SafeLease needs to know who Storable's FMS customers are. Storable's position is that such discovery efforts would bear no fruit, and that may prove true. But the adversarial nature of litigation means that parties are typically entitled to seek relevant discovery rather than rely on their opponents' contentions that they will not find anything.

¶44    Similarly, Storable argues repeatedly that its API agreements foster, rather than harm, competition in the tenant-insurance market.[89] Again, SafeLease may seek to controvert this contention, which would likely entail discovery on Storable's FMS customers and their insurance providers to determine whether and how the terms and changes to Storable's API agreements and procedures have impacted competition and consumer choice. For example, SafeLease alleges and put on evidence at the TI hearing that Storable would allow SafeLease API access

surance space, much less monopolize it. Even assuming arguendo that Storable attempted to exclude SafeLease, there is zero evidence that Storable 'drove out' or even attempted to 'drive out' any other tenant insurance competitors.").

[89] *Id.* at 2, 4, 13, 15, 16.

only if SafeLease agreed to pay $1 per unit per month for SafeLease customers that were not previously customers of one of Storable's insurance entities but $1.50 per unit per month for SafeLease customers that had previously used one of Storable's insurance entities.[90] SafeLease describes this as a penalty for competing for (and winning) Storable insurance customers. With the FMS customer list, SafeLease could discover the effects (if any) of such pricing structures on Storable's FMS customers and their insurers.

¶45    Likewise, Storable asserts in its motion that it "entered API agreements with every other tenant insurance company that requested one."[91] Storable may seek to test this contention with discovery from Storable's FMS customers to determine who their tenant-insurance providers are and whether any of them pursued an API agreement with Storable but were turned away or unable to agree to the terms.

¶46    SafeLease should be able to present its best case in response to the motion for partial summary judgment, so that its antitrust claim can survive or fail based on the merits rather than denial of relevant discovery. Under the circumstances, it would be circular—a "Catch-22"—to deny discovery of relevant evidence on the grounds that summary-judgment might be granted and then grant

---

[90] Second Am. Pet. at ¶¶ 59–60; 2.11.2025 TI Tr. at 129:1–13; 2.14.2025 TI Tr. at 45:22–25.

[91] MPSJ at 24.

summary judgment on the grounds that SafeLease failed to present evidence raising a fact issue.

### C. Does the Agreed Protective Order adequately protect the customer list?

¶47    The Texas Supreme Court has repeatedly advised that protective orders can help reduce the risk of potential harm from disclosure of trade secrets or other confidential information.[92] "Even if the requested documents contain confidential information or trade secrets," the party seeking to withhold the documents has the burden to show "that an appropriate protective order will not address their concerns."[93] Storable has not made such a showing.

¶48    At the request of the parties, the Court entered an Agreed Protective Order in this case. It offers one of the highest levels of protection available in such an order: an Outside Counsel's Eyes Only (OCEO) designation that limits disclosure to specific persons involved in this case and excludes the opposing party and its employees (including in-house counsel) from viewing the material.[94] The Court has ruled that Storable's FMS customer list is entitled to OCEO designation

---

[92] *See, e.g.*, *In re K & L Auto Crushers, LLC*, 627 S.W.3d 239, 255–56 (Tex. 2021) (orig. proceeding); *In re ExxonMobil Corp.*, 635 S.W.3d 631, 635 (Tex. 2021).

[93] *K & L Auto Crushers*, 627 S.W.3d at 256; *see also In re ExxonMobil Corp.*, 635 S.W.3d at 635 ("[T]he providers' objection that the requests seek confidential information or protected trade-secret information also fails. A protective order could easily shield the information from unnecessary disclosure, and the providers failed to establish why such an order would be insufficient to protect their interests. … [T]o the extent it relied on concerns about confidentiality or trade secrets, it abused its discretion by failing to consider whether it could have permitted discovery while issuing a protective order.").

[94] Agreed Protective Order at ¶¶ 3, 5–6.

under the Agreed Protective Order.[95] The Court has also excluded Mr. Locke, one of SafeLease's outside counsel who previously worked for SafeLease and currently acts as its outside general counsel, from OCEO access to the customer list.[96]

¶49　The dangers Storable alleges are that the customer list will fall into the hands of one of its FMS competitors or that it will fall into SafeLease's hands and SafeLease will abuse its access to the information, in violation of the Court's orders.[97] The Court concludes that, under the circumstances of this case, any such danger is adequately mitigated by the OCEO protections of the Agreed Protective Order and the subsequent rulings in this case. This is true for several reasons.

¶50　First, the Agreed Protective Order reflects the protections that both sides negotiated and agreed to for OCEO material, which the parties expressly contemplated would include "trade secrets."[98]

¶51　Second, the only additional protection Storable has requested from the Court to supplement the OCEO protections under the Agreed Protective Order is that Mr. Locke be denied access, which the Court has granted with respect to the customer list.[99]

---

[95] Order on Mots. for Recons.; Other Relief, dated June 23, 2025, at ¶ 1.

[96] *Id.* at ¶ 2.

[97] Mot. for Recons. at 6–7 & Gordon Decl., ¶¶ 9–10.

[98] Agreed Protective Order at ¶ 3.

[99] Order on Mots. for Recons.; Other Relief, dated June 23, 2025, at ¶ 2.

¶52   Third, Storable does not argue, and the evidence does not establish, that there is a material risk that one or more of Storable's FMS competitors will obtain Storable's FMS customer list as a result of its production in this case. Under the Agreed Protective Order, access to OCEO-designated material is limited to:

- Counsel of record and their staff;

- court personnel;

- the producing party's corporate representative and the document's author and original recipient, if they are still employed by the producing party and still entitled to access; and

- experts and necessary vendors engaged in this case, if they sign an agreement to be bound by the Agreed Protective Order.[100]

¶53   Storable has not presented evidence of any particular risk that the court, the law firms of Yetter Coleman and Stone Hilton (SafeLease's counsel), or their experts and essential vendors will violate their obligations under the Agreed Protective Order by disclosing Storable's FMS customer list to one of Storable's FMS competitors—or even that any of these people are likely to have any contact with any of Storable's FMS competitors.

¶54   Fourth, Storable does argue that there is a material risk that SafeLease will misuse the Customer List, pointing out that SafeLease has advised some Storable FMS customers to consider switching FMS providers.[101] But even if SafeLease were inclined to violate the Court's order and abuse its access to

---

[100] Agreed Protective Order at ¶¶ 5–6.

[101] Mot. for Recons. at 7, 10.

33

Storable's FMS customer list, SafeLease will not have access to the customer list. The Agreed Protective Order expressly excludes party access to OCEO material.[102]

¶55    There is no evidence that anyone at Yetter Coleman or Stone Hilton is likely to disclose the customer list to SafeLease in violation of the Agreed Protective Order. Moreover, if Storable felt that SafeLease's outside attorneys (or anyone else with access to OCEO material under the Agreed Protective Order) presented a particular risk of disclosure, intentional or inadvertent, Storable could have moved to exclude any such person from OCEO access. Storable did exactly that with respect to Mr. Locke, and the Court has excluded Mr. Locke from accessing the customer list in mitigation of that perceived risk.

¶56    With respect to Storable's FMS customer list, the Court has afforded Storable all of the protections against disclosure it has requested short of denying discovery entirely and will consider any further protections needed.[103]

¶57    Lastly, Storable also argues that there is a risk that an appellate court will hold that this Court lacks jurisdiction over this action and render the Agreed Protective Order void, leaving the customer list unprotected.[104] SafeLease disagrees, arguing that the only challenge to jurisdiction in this case is based on

---

[102] Agreed Protective Order at ¶¶ 3, 5–6.

[103] *See K & L Auto Crushers*, 627 S.W.3d at 255–56; *In re N. Cypress Med. Ctr. Operating Co.*, 559 S.W.3d 128, 137 (Tex. 2018) (orig. proceeding).

[104] Mot. for Recons. at 9; Mot. for Partial Stay of Produc. Deadline at 5.

the timeliness of SafeLease's removal, which is a "procedural defect—not a juris-dictional one."[105] Thus, SafeLease argues that even if Storable prevails on its challenge on appeal, the Agreed Protective Order will not be void.[106]

¶58    SafeLease also points out that, before the parties obtained the Agreed Protective Order in this case (in fact, while the case was still in the district court), they operated under a Rule 11 Agreement that provides the exact same protections as the Agreed Protective Order.[107] SafeLease contends that the Rule 11 Agreement would remain in effect even if the Agreed Protective Order were voided and the case were remanded to the district court. Storable did not deny this, and both parties took the position at hearings in both this Court and the district court that the Rule 11 Agreement governs the production in this case.[108]

¶59    Finally, even if an appellate court rules that this Court does not have jurisdiction, and even if the Agreed Protective Order were void, and even if there were not a Rule 11 Agreement in place, Storable could seek ancillary relief from the appellate court until a new protective order could be entered. Moreover, since SafeLease itself concedes that it will remain bound to maintain the confidentiality of the customer list regardless of the outcome of the appeal, there seems to be little

---

[105] Resp. to Mot. for Recons. at 5 (quoting *Quintero Cmty. Ass'n Inc. v. F.D.I.C.*, 792 F.3d 1002, 1007 (8th Cir. 2015) (quote omitted)).

[106] *Id.*

[107] *Id.*; *id.* at Exh. 2.

[108] 2.11.2025 TI Tr. at 74:25–75:2, 234:4–6.

risk that SafeLease's attorneys would use the outcome of the appeal as an excuse to disclose Storable's customer list.

## Conclusion

¶60    The Court therefore denied Storable's Motion for Reconsideration.

Date signed: July 18, 2025

Hon. Melissa Andrews
Judge of the Texas Business Court,
Third Division

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 103306319
Filing Code Description: No Fee Documents
Filing Description: Opinion on Motion for Partial Reconsideration of the Court's May 28, 2025 Discovery Order
Status as of 7/18/2025 11:25 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Ray TTorgerson | | rtorgerson@porterhedges.com | 7/18/2025 10:52:51 AM | SENT |
| Delonda Dean | | ddean@yettercoleman.com | 7/18/2025 10:52:51 AM | SENT |
| Yetter Coleman | | efile@yettercoleman.com | 7/18/2025 10:52:51 AM | SENT |
| Carolyn Reed | | creed@porterhedges.com | 7/18/2025 10:52:51 AM | SENT |
| Courtney Smith | | csmith@yettercoleman.com | 7/18/2025 10:52:51 AM | SENT |
| Melissa Sanchez | | Melissa.Sanchez@arnoldporter.com | 7/18/2025 10:52:51 AM | SENT |
| Edockets Calendaring | | eDocketsCalendaring@arnoldporter.com | 7/18/2025 10:52:51 AM | SENT |
| Andrew Bergman | | andrew.bergman@arnoldporter.com | 7/18/2025 10:52:51 AM | SENT |
| Elizabeth FEoff | | leoff@porterhedges.com | 7/18/2025 10:52:51 AM | SENT |
| Katherine G.Treistman | | Katherine.Treistman@arnoldporter.com | 7/18/2025 10:52:51 AM | SENT |
| Luke A.Schamel | | lschamel@yettercoleman.com | 7/18/2025 10:52:51 AM | SENT |
| Christopher Hilton | | chris@stonehilton.com | 7/18/2025 10:52:51 AM | SENT |
| Judd Stone | | Judd@stonehilton.com | 7/18/2025 10:52:51 AM | SENT |
| Alyssa Smith | | asmith@yettercoleman.com | 7/18/2025 10:52:51 AM | SENT |
| Bonnie Chester | | bonnie@stonehilton.com | 7/18/2025 10:52:51 AM | SENT |
| Jonna NSummers | | jsummers@porterhedges.com | 7/18/2025 10:52:51 AM | SENT |
| Lakshmi NKumar | | lkumar@porterhedges.com | 7/18/2025 10:52:51 AM | SENT |
| R. PaulYetter | | pyetter@yettercoleman.com | 7/18/2025 10:52:51 AM | SENT |
| Susanna R.Allen | | sallen@yettercoleman.com | 7/18/2025 10:52:51 AM | SENT |
| Justin Bernstein | | bernsteinju@gtlaw.com | 7/18/2025 10:52:51 AM | SENT |
| Business Court Division 3A | | bcdivision3a@txcourts.gov | 7/18/2025 10:52:51 AM | SENT |
| Dolores Brunelle | | dbrunelle@porterhedges.com | 7/18/2025 10:52:51 AM | SENT |

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 103306319
Filing Code Description: No Fee Documents
Filing Description: Opinion on Motion for Partial Reconsideration of the Court's May 28, 2025 Discovery Order
Status as of 7/18/2025 11:25 AM CST

Case Contacts

| Dolores Brunelle | | dbrunelle@porterhedges.com | 7/18/2025 10:52:51 AM | SENT |
|---|---|---|---|---|
| Cathy Hodges | | catherine.hodges@aporter.com | 7/18/2025 10:52:51 AM | SENT |
| Mikaila Skaroff | | mikaila.skaroff@arnoldporter.com | 7/18/2025 10:52:51 AM | SENT |
| Rosalinda Luna | | rosie@stonehilton.com | 7/18/2025 10:52:51 AM | SENT |
| Adam Locke | | adam@lockelaw.com | 7/18/2025 10:52:51 AM | SENT |
| John Holler | | john.holler@arnoldporter.com | 7/18/2025 10:52:51 AM | SENT |
| John Holler | | john.holler@arnoldporter.com | 7/18/2025 10:52:51 AM | SENT |
| John Holler | | john.holler@arnoldporter.com | 7/18/2025 10:52:51 AM | SENT |
| John Holler | | john.holler@arnoldporter.com | 7/18/2025 10:52:51 AM | SENT |
| John Holler | | john.holler@arnoldporter.com | 7/18/2025 10:52:51 AM | SENT |
| John Holler | | john.holler@arnoldporter.com | 7/18/2025 10:52:51 AM | SENT |
| Alexander Dvorscak | | alex@stonehilton.com | 7/18/2025 10:52:51 AM | SENT |
| Shannon Smith | | ssmith@yettercoleman.com | 7/18/2025 10:52:51 AM | SENT |
| Dale Wainwright | | dale.wainwright@gtlaw.com | 7/18/2025 10:52:51 AM | SENT |
| Julia C.Risley | | jrisley@yettercoleman.com | 7/18/2025 10:52:51 AM | SENT |